EMILIO GARCIA, JOSE RODRIGUEZ AND CAMILIO SANS, PLAINTIFFS IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

1. Where the judgment of the Circuit Court refusing a motion for change of venue in a criminal case is a plain and palpable abuse of the discretion permitted by law in such cases, it is such error as requires the interference of the appellate court and a reversal of the judgment.

2. The evidence offered by the plaintiffs in error on their motion for change of venue, as fully set out in the opinion herein, not being disputed by any evidence upon the part of the State, was such a showing as necessitated a change of the venue, and the refusal to grant the motion was error.

3. Our statute (R. S. sec. 2918) simply permits the court in criminal cases "to order a view by the jury." Being a criminal statute it should be strictly construed, and in the absence of any provision as to the manner of making the view, the action of the jury should be confined to a view—i. e., a seeing of and inspection of the premises.

4. The statute cited in the preceding head-note does not authorize the examination of witnesses before the jury while they are away from the court house engaged in taking the view ordered by the court. Where there is a county court house in the county, that is the proper place for the trial of criminal cases, and no portion of the trial should be removed to any other place without express authority of law.

5. In the absence of legislative provisions describing the mode in which jury views are to be conducted, it is more in consonance with the theory and methods of judicial trials that the jury

should base their findings solely upon sworn testimony in open court, or by depositions taken as provided by law.

6. The extent to which the Circuit Court may go in ordering a view by a jury in a criminal case is to dire't a view of the premises, where a crime is supposed to have been committed, by the jury. The defendants and counsel for the respective parties may be permitted to accompany them, and some person selected by the parties, or named by the court, may accompany the jury to point the premises out to them.

7. Plaintiff's in error offered evidence tending to establish an *alibi* for some of them. Their counsel insisted that such evidence was not offered to prove an *alibi*, but only to contradict other evidence offered by the State, and insisted that the court should not charge the jury as to the law upon the subject of *alibi*: *Held*, that the court should charge the jury upon the law applicable to the evidence given by the witnesses, and is not bound to accept the construction placed upon such evidence by counsel.

8. The court in an instruction to the jury upon the subject of *alibi*, after stating in effect that it need not be proved by the defendants beyond all reasonable doubt, but that "it was sufficient if, when taken with all the testimony, it raised a reasonable doubt in the minds of the jury of the presence of the defendants, or either of them, at the commission of the crime," said "*then it will be your duty to acquit all, or such of the defendants as you so believe not to have been present at the commission of the crime:*" *Held*, that the portion of this charge in italics was erroneous. Instead of such language the following should have been used, *viz:* "Then it will be your duty to acquit all of the defendants to whom such reasonable doubt applies."

Writ of Error to the Circuit Court for Monroe county.

The facts of the case are stated in the opinion of the court.

*Jefferson B. Browne* and *N. B. K. Pettingill*, for Plaintiffs in Error.

*William B. Lamar, Attorney-General,* and *Thomas Palmer* for the State.

LIDDON, C. J.:

The plaintiffs in error were indicted at the Spring term, 1893, of the Circuit Court of Monroe county, for the murder of one Jaime Mira. Thirty-five assignments of error are made here. We shall consider such of them as appear necessary to a proper disposition of the case.

The first three assignments relate to rulings of the court overruling motions of the plaintiffs in error (defendants below) for a change of venue. It is alleged that several motions were made for such change of venue, but the bill of exceptions shows only one, which was made at the Spring term, 1894. We confine ourselves, therefore, in considering this question, to the third assignment of error, which is predicated upon this ruling. This motion was upon the ground that the defendants could not "obtain a fair and impartial trial before a jury in said county of Monroe, as shown by affidavits filed and refiled with the motion and prayed to be taken as a part of it. A number of affidavits which had been offered with previous motions of the same character were refiled, together with additional affidavits from the respective defendants, that the statements in said former affidavits were still. true and as applicable to said cause as when the same were made. New affidavits were also originally filed and considered by the court upon the motion. Fernando Figueredo and Jose C. Bolano, after confirming a previous affidavit and asserting its present applicability to the case, deposed, in substance, as follows: Since the last term of this court serious trouble has arisen between the Cuban inhabitants of said county, to which race defendants belong, and the other inhabitants thereof; that as a consequence of said trouble,

314 SUPREME COURT.

Garcia, Rodriguez and Sans v. State of Florida.—Opinion of Court.

a very strong feeling of ill-will and prejudice exists against said Cuban inhabitants in general, which will tend still further to the harm and injury of the defendants before a jury of said county, and will greatly increase the prejudice against the defendants; and deponents verily believe that said defendants can not obtain a fair and impartial trial before a jury of said county. That very few of the Cuban inhabitants of said county speak English well enough to sit on a jury, and that practically none of said Cuban inhabitants are qualified in all respects so as to be eligible to sit upon a jury in said county. Mortimer Falk and John Denham deposed that they were citizens of Key West, in said county; that they had heard various persons express opinions in regard to the guilt of defendants, and were acquainted with the general sentiment of the community in regard thereto; that from what they have heard, and their knowledge of such prevailing sentiment, they believe that defendant could not obtain a fair and impartial trial in said county; that they had heard citizens of said county say that the defendants ought to be convicted on general principles, and that deponents believed that such was the prevailing sentiment among the people of said county. J. I. Ricker deposed, in substance, that he had been a resident of Monroe county for more than ten years; that he was engaged in running a saw-mill—sawing wood for family use; that he was not acquainted with the defendants; that he never saw either of them until he was called upon a jury which tried them a year before; from statements which he had heard from citizens of said county expressive of their opinion, he did not believe that the defendants could get a fair and impartial trial in said county; that deponent was on the jury which tried these defendants in June before, and heard

jurors discuss matters, as a reason for the conviction of the prisoners, which were not in evidence before the jury. It was argued in the jury room that Emilio Garcia killed a man in Havana, though there was no evidence of such fact before the jury; that one juror discussed in the jury room matters of fact of which he claimed to have knowledge, but which were not testified to by any witnesses; that this same juror told of matters of fact which he claimed to have learned from the principal State witnesses, notwithstanding that he had sworn that he had had no conversation with any of the witnesses, and that this same juror discussed in the jury room matters which he claimed to know by having been around with leading witnesses for the State in search of evidence against the defendants; that several of the jurors used as an argument with him, to influence him to bring in a verdict of guilty against the prisoners, that the community expected them to convict the said defendants; that after the verdict in said case was rendered, it became known that the deponent was the only juror who had held out for an acquittal, and had caused the disagreement of the jury, and that from that time deponent began to suffer in his business, on account of the part he had been compelled, upon his oath as a juror, to perform in said case; customers left him, and others tried to influence more of his customers to leave him on that account; that from all he had heard, and the knowledge he had of the feeling existing throughout the whole community he did not believe that the defendants could get a fair and impartial trial in said county of Monroe. Peter T. Knight deposed that he resides in the city of Key West, and is Clerk of the Circuit Court for the county of Monroe; that the indictment against the above named defendants was found at the Fall term of

said Court in the year 1891, but that said parties were arrested in the month of May, 1891, and that the said Emilio Garcia, and Jose Rodriguez had a preliminary examination before W. A. Gwynn, a justice of the peace, in the month of June of that year; that from the time said arrests were made great excitement prevailed in the city of Key West over the affair, and the whole community was aroused by inflammatory articles in the local press against the defendants, calling upon all good citizens to help see to it that they were at last brought to justice for a long list of offenses of which said articles pronounced said defendants, and especially the defendant Emilio Garcia, to be guilty, and that the community was by that means rid of a gang of cut-throats and murderers, of which said defendants were alleged to be numbered; that by means of such articles, and by the active endeavors of certain persons in the community, the public mind was so prejudiced and excited against said defendants that threats of lynching them were openly made, crowds gathered around the jail and public meetings were held at which large rewards were offered for the production of evidence which would convict said defendants, and resolutions were adopted calling upon the State to offer additional rewards for the same purpose, and every means employed to violently prejudice and excite the whole community against said defendants. That said defendants Garcia and Rodriguez were by the said justice Gwynn, at said preliminary hearing, committed to jail without bail, and that a writ of *habeas corpus* was thereafter sued out in said Circuit Court in behalf of said defendants, and the sheriff of said Monroe county was, as deponent was informed and believes, ordered by the judge thereof to produce said defendants before him at Tampa, Florida, for the hearing of

said writ; that when it became known in Key West that said order had been made, violent excitement again took possession of the community, and a meeting was held at which it was resolved that said defendants should not be allowed to leave the island, and a. committee was appointed to notify the sheriff to that effect, and that he would attempt to remove them at his peril; that during the night when the boat was to leave, upon which it was thought the attempt would be made to remove them, a large crowd of excited men surrounded the jail, in numbers not less than five or six hundred, for the expressed purpose of preventing at all hazards their removal, in obedience to said order of the court; that said crowd, or portions thereof, continued to surround said jail until the departure of said steamer, and during the greater part of said night; and that among the members of said crowd threats of lynching said defendants were frequently made, and great excitement prevailed; and deponent says that a deep-seated and almost universal prejudice against the said defendants has for a long time existed, and still exists, in the said county of Monroe; and that he verily believes that the said defendants can not obtain a fair and impartial trial before a jury of said county. That the total number of legally qualified jurors in said county is not over nineteen hundred, and of that number about six hundred or more are unable to speak or understand the English language; that at the trial of Emilio Garcia, at the Spring term of the court, 1892, venires summoning at least one hundred and thirty-five men were issued and exhausted before a jury of twelve men could be empanneled, and that during said trial the court room was crowded from day to day with citizens of said county listening to said evidence, the number present averaging at least four

hundred, and the evidence as given was published daily in the local press, and was the common topic of conversation among all the people. That he believes that as a consequence of these facts it would be impracticable to get a qualified jury in said county to try said cause. Fernando Figueredo also deposed, corroborating most of the allegations of the affidavit of Peter T. Knight, and also, in addition, that a large reward had been offered by the County Commissioners of Monroe county for evidence leading to the conviction of the defendants; that threats of lynching were freely indulged in, and the prevailing sentiment was that defendants should not be allowed to leave the island alive. Charles F. Dupont deposed that he was the sheriff of said county of Monroe, and had been ever since the arrest of the said defendants in the month of May, 1891; that the said Emilio Garcia and Jose Rodriguez had a preliminary examination, on the charge for which they stand indicted, before justice Gwynn in the city of Key West about the first of June, 1891, and that there was great excitement in the community over said examination at that time; that said defendants were by said justice Gwynn committed without bail to await the action of the grand jury. In a few days thereafter a writ of *habeas corpus* was sued out in their behalf in the Circuit Court, and deponent received a telegram from Hon. H. L. Mitchell, Judge of said court, ordering him to produce said prisoners at Tampa, Florida, for the hearing of said writ; that when it became public that said order had been made, great excitement and very strong feeling was aroused in the community against such removal, and this deponent was waited upon by a deputation of persons who represented to deponent that they had been appointed by a public meeting that day held to

notify him that said prisoners would under no circumstances be allowed to leave the island, and that if he attempted to obey said order of the court, in removing them, he would do so at his peril. And deponent says that it was his opinion from his knowledge of the feeling of the community that said prisoners could not be removed by any force at his command without bloodshed, and therefore after receiving said notice he did not make any attempt to remove them, and gave his promise to said persons that they should not be moved; notwithstanding which a large crowd surrounded the jail in which said prisoners were confined, on the night when the steamer left for said Tampa, and remained until after the departure of said steamer, and during the greater portion of said night, said crowd being very excited and expressing the purpose to prevent the removal of said prisoners at all hazards, and numbering not less than five or six hundred people. Jose C. Bolano deposed that he was a citizen of the city of Key West, in said county of Monroe; that he has known of the proceedings against said defendants since their arrest upon the charge of murdering Jaime Mira in the month of May, 1891; that at the time of making said arrests, and from then since, great excitement has prevailed in the community over said murder, and violent and deep-seated prejudice has been formed therein against said defendants; that said excitement has been increased and said prejudice strengthened by articles published in the local press, alleging that said defendants were members of a gang of murderers and outlaws who have been guilty of a long series of crimes in said community, and urging the people to take every means to secure the conviction of said defendants in this case, in order to punish them for the many other crimes which it was claimed

they had committed, and to rid the community of the dangerous band of which it was claimed they were members; that public meetings have been held, at which resolutions were adopted recommending the offer of large rewards by the proper authorities for the production of evidence leading to their conviction, and organizing committees to assist in obtaining that result; that large rewards were accordingly offered for the production of such evidence as would secure the conviction of said defendants; and that the public mind was thereby excited and prejudiced to that extent that threats of lynching were freely indulged in, and the prevailing sentiment of the community was that said defendants should not be allowed to leave the island alive; and that on one occasion, in the month of June, 1891, a large crowd gathered round the jail where said defendants were confined for the express purpose of preventing them from being removed, by force if necessary. That said prejudice against said defendants still exists, and is almost universal in said community; that large crowds of the citizens have attended each of the several hearings of said cause which have been held in Key West; that the evidence given at said hearing has been published in the daily press and universally read; and that on account of these facts deponent belives that said defendants can not obtain a fair and impartial trial before a jury of said county, and that it would be impracticable to obtain a qualified jury for the trial of said cause therein. The defendants Emilio Garcia, Jose Rodriguez and Camillo Sans deposed that they are the defendants in this cause, in whose behalf the motion for a change of venue is now interposed; that a deep-seated and universal prejudice against them prevails in said county of Monroe, as shown by the

other affidavits attached to this motion, the matters set forth in which are true; and that they severally verily believe that they can not obtain a fair and impartial trial in said county of Monroe. N. B. K. Petingill deposed that he is one of the attorneys of record for the defendants in this cause, and has been engaged therein since the first arrest of the said defendants in May, 1891; that he was present at all the hearings in said matter, and had charge of preparing the motion for a change of venue presented herein at the last Fall term of this court, and filed December 1st, 1892, and of procuring affidavits in support thereof, setting forth the occurrences which had transpired in the city of Key West tending to show violent feeling and prejudice in said community against said defendants; that he spent considerable time and much labor in trying to procure said affidavits, and requested a large number of persons to make affidavits to such facts as were known to them in connection therewith, but with the exception of the four persons whose affidavits are attached to said motion, no one would consent to do so; that nearly every one of the persons so requested by deponent to make said affidavits admitted that they knew of the matters desired to be sworn to and the statement of such facts which they were desired to make was true and correct, but refused to make any affidavit or take any part in favor of said defendants on the ground that the feeling against said defendants was so strong in the community that any action in their favor, however slight, would cause injury to them in their business, and might cause them trouble in other ways; but not one of the persons requested to make affidavit refused to do so on the ground that the matters desired to be sworn to were untrue in any respect;

that additional efforts have been made before and during the present term of the court to obtain additional affidavits in support of said motion, but the persons so requested to make the same have refused to do so for the same reasons given above, and it has been impossible, on account of the intense and universal prejudice and feeling so existing, to obtain additional affidavits in support of said motion. Peter T. Knight made an additional affidavit as follows: That he was present during a part of the trial of the above cause at the Spring term of the court aforesaid, A. D. 1893, and that J. R. Ricker was one of the jurymen empanneled to try said cause at said term; that the said jury in said cause failed to agree upon a verdict, and were discharged without agreeing, and it was popularly reported and believed that the said J. R. Ricker was the juryman refusing to agree to a verdict of guilty against the said defendants; that within a few days after the final adjournment of said court for said term, deponent heard citizens of Key West say that said J. R. Ricker was being boycotted because of his action as a member of the jury in said cause in refusing to convict the said defendants, and that it was right that he should be; that about the same time as the above, or soon thereafter, he heard numerous persons in the city of Key West, including several prominent citizens of the said county of Monroe, soberly assert and maintain that the said defendants, and especially the defendant Emilio Garcia, should be convicted and hung on account of his general bad record, whether the evidence of the particular crime charged in the indictment in this cause was sufficient to prove guilt thereof or not; and deponent believes that the opinion above specified prevails widely through the said county of Monroe, to the prejudice of the said defendants in this

cause. Jefferson B. Browne also made affidavits which, with exhibits attached to the same, was as follows: That the article, a copy of which is hereto attached marked exhibit A, was published as an editorial in the Daily Equator-Democrat, in the issue of Monday, December 12th, 1892, or very near that date; and that the articles attached, and marked exhibits B and C, were published in the same newspaper on June 13th, 1893; that said Equator-Democrat has taken an active part in voicing and trying to form public opinion in the foregoing cause.

### EXHIBIT A.

The Tampa Review puts a wrong construction on the Garcia case. Garcia was once protected in this town and kept from being lynched by the law and order-loving people of the place, with the understanding from the sheriff that he would disobey the order of the judge of this circuit and refuse to remove him. To have attempted to do otherwise, however, would have precipitated what the cool heads were trying to avoid. Garcia can get a fair and impartial trial in this city, and if he is acquitted here, and gets out of the town within a reasonable time, he will not be molested, *but he can not live here;* but, on the other hand, if there is an attempt to remove him to another county for trial, we anticipate trouble, and it certainly would be unadvisable for the governing powers to put the people of this community in a position of this kind when they see as well as we what the consequences will be. We have proved that the men are safe if tried in this county, and that they will be accorded a fair trial, and we have presented to the judge of this circuit a petition setting forth these facts, and signed by the leading citizens of the place. Judge Sparkman has shown that he is a man of considerable tact; and we believe

that he will see the handwriting on the wall in this instance, and not give the people of this town an excuse to wreak mob vengence upon those who, if not guilty of this crime, have long ago forfeited all claims to leniency. The following is the article of the Review: Trouble is reported at Key West owing to the attempt to secure a change of venue to this county in the case of Emilio Garcia before the bar on a charge of the murder of Jaime Mira. Garcia was tried here some years ago for the murder of Manuel Martinez, in the attack made upon the Knights of Labor at Ybor City. He was acquitted and went to Key West, and in consequence of his doings in that city the Cubans declare that he shall not leave it alive. Should a verdict of acquittal be found, or an attempt be made to bring him to Tampa, a riot is feared.

### EXHIBIT B.

It is reported that about half the important witnesses in one of the murder cases are not within call. A combination to defeat the ends of justice in the State vs. Garcia and others will recoil upon the heads of those who are doing it with terrible effect. These men are guilty—the community knows it; justice had better take its course.

### EXHIBIT C.

There is a feeling in the city that some of the negro murderers now confined in the jail are to be convicted, and an outraged public thus appeased, so that when Garcia and Rodriguez are put upon trial and cleared nothing will be said by the public. If those who think this try it, they may find that the lapse of two years has in no wise changed public opinion. The public recognize the fact that since Garcia, Rodriguez and Sans have been in jail, and the thirty other mis-

creants run out of this city, that crime against other Cubans has well nigh ceased, while the city has been free from assassinations. We are not ready to undo what has been done in the past two years, and go back to the old days of blackmail and mysterious murders.

It does not appear in the record that any evidence whatever was offered upon the part of the State in contradiction of the affidavits offered upon the part of the defendants. In matters of change of venue very much must be left to the discretion of the trial court. As a general rule appellate courts will not interfere with an exercise of the discretion by the court below in granting or refusing motions for a change of venue, still the exercise of such discretion is a subject of review by the appellate court, and it will interfere where there is a palpable abuse or grossly improvident exercise of such discretion. Greeno vs. Wilson, 27 Fla., 492, 8 South. Rep., 723; McNealy and Roulhac vs. State, 17 Fla., 198: Irvin vs. State, 19 Fla., 872; Adams vs. State, 28 Fla., 511, 10 South. Rep., 106; Williams vs. Dickenson, 28 Fla., 90, 9 South. Rep., 847. There being no showing of facts upon the part of the State, or any apparent resistance to the motion, the problem before us is whether, upon the statements contained in the affidavits offered by defendants, the refusal to change the venue was such an abuse of judicial discretion as calls for the interference of this court. Briefly summarized, the salient facts of the affidavits offered by defendants are these: That the defendants are Cubans; that strong feelings of prejudice and ill-will existed between the Cubans and other inhabitants of the island of Key West; that few Cubans speak English well enough and practically none are qualified to serve upon juries in the county of Monroe; that the

prevailing sentiment of the community was strongly against defendants, and great prejudice and feeling prevails against them in said county; that prominent citizens had been heard to declare that the defendants ought to be convicted on general principles; that one Ricker, who had sat as a juror in a trial which had resulted in a mistrial, and who had been the juror who had by refusing to find a verdict of guilty, caused such mistrial, had suffered in his business on account of his action in such case; that said Ricker had been for said reason boycotted in his business, and citizens of Key West had said that it was right that he should be so; that much prejudice and excitement against defendants had been aroused by inflammatory articles circulated in newspapers against them; that said articles called upon all good citizens to see to it that defendants were at last brought to justice for a long list of offenses of which they, especially the defendant Emilio Garcia, were said to be guilty; that defendants were alleged in said newspaper articles to be members of a gang of cut-throats and murderers; and threats of lynching defendants had been openly made; crowds gathered around the jail and public meetings were held, at which large rewards were offered for the production of evidence which would convict said defendants, and resolutions were adopted calling upon the State to offer additional rewards for the same purpose; that on one occasion a writ of *habeas corpus* had been sued out by the defendants, and upon such writ the sheriff had been ordered to produce them at Tampa before the Circuit Judge, for the purpose of hearing such writ; that when it became known in Key West that such order had been made violent excitement took possession of the community, and a meeting was held, at which it was resolved that the defendants should

not be allowed to leave the island, and a committee was appointed to notify the sheriff that he would attempt to remove them at his peril; that when it was thought an attempt would be made to remove the prisoners to Tampa in obedience to the aforesaid order, a large crowd of five or six hundred excited men surrounded the jail for the express purpose of preventing removal of the prisoners in obedience to the order of the court, and continued to surround said jail until the vessel, upon which it was intended to remove the defendants, had sailed, and among said crowd many threats of lynching the defendants were made; that only nineteen hundred registered voters are in the county of Monroe, of which number six hundred or more are unable to speak or understand the English language; that former trials had been had of the case, at one of which a venire of one hundred and thirty-five men was exhausted before a panel of twelve jurors could be obtained, and that during the said trials the court house was crowded from day to day with citizens hearing the testimony in the same; that a large reward was offered by the county commissioners of Monroe county for evidence leading to the conviction of the defendants; that a large mob had prevented the sheriff removing the prisoners to Tampa in obedience to the aforesaid writ of *habeas corpus*, and had forced the sheriff to give them a promise that they should not be so removed; that persons had refused to make affidavits to be used upon defendants' motion for a change of venue on the ground that the feeling against the defendants was so strong in the community that it would cause them injury in their business; that numerous persons in Key West, including prominent citizens of said city, were heard to maintain that the defendants, especially the defendant Emilio Garcia, should be con-

victed and hung on account of his general bad record, whether the evidence in this particular case was sufficient to prove guilt thereof or not. The extracts from the daily Equator-Democrat sustain the allegations as to their inflammatory character, the nature of which will directly be more particularly noted.

The foregoing undisputed allegations, in our opinion, shows such a state of feeling at the time in the county of Monroe as to have imperatively required a change of the venue; and the refusal thereof was such a palpable abuse of judicial discretion as to call for our interference. We do not think it likely that a stronger case will ever arise under the statute. It can not be doubted from the proof made on behalf of defendants, that the people of the island of Key West which, in point of population, very nearly comprises the county of Monroe, are greatly incensed against the defendants. Whether this exasperation is justly or unjustly aroused against them does not affect the present purpose of this decision, and we can not express our opinion upon the subject. In the heart of nearly all people is a horror of crime. This is a worthy sentiment, and it is but natural that it should lead to abhorrence of and antipathy against those charged with odious crimes. It is upon this principle that the mob whose intentions are not entirely bad when its indignation against crime is aroused administers its wild and unreasoning justice. But in a court of law naught should be heard but the voice of law and reason. So the law which guarantees every man a fair trial ordains that whenever the natural sentiment of abhorrence of crime is so aroused in a community that it brings public odium and detestation upon the person accused of the crime, so that the voice of law and reason might be lost amid the clamor of passion and

prejudice, the trial should be removed to some other community not affected by such influences. When a proper case is presented, to refuse such a change of the place of trial, would be mob law inside, instead of outside, of the court house. It is said on the part of the State that the defendants could secure a fair and impartial trial in the county of Monroe, and as a demonstration of this contention, that they did secure such a jury, having challenges still unexhausted when the panel was completed. It is claimed that the judge had a right to make a practical test by attempting to empannel a jury, whether a fair and impartial jury could be obtained. We do not think such a course warranted by the law. The court must determine the question upon the affidavits offered by the State and the defendant. Our statute (R. S. sec. 2927) says: "When it shall appear to the satisfaction of the court by affidavit that a fair and impartial trial can not be had in the county where the crime was committed, the court may direct the accused to be tried in some adjoining county." The law does not permit any other test than a consideration of the evidence offered. Applications for change of venue upon the ground that a qualified jury can not be had in the county, which might perhaps warrant a practical test to be made, are governed by the succeeding sections, 2928 *et seq.* See also Territory vs. Manton, 8 Montana, 95. It can not be contended that the excitement and feeling shown by defendants' affidavits in this case were only a natural exhibition of the horror of the crime of murder and secret assassination which exists in all communities. The evidence is abundant to show that the prejudice and feelings complained of existed against the individual defendants. In illustration of this might be cited, besides the threats of lynching and the actions

330 SUPREME COURT.

Garcia, Rodriguez and Sans v. State of Florida.—Opinion of Court.

of the mob in preventing obedience of the sheriff to the writ of *habeas corpus*, the peculiar circumstances attending the offer of rewards. This was a case of secret assassination. A reward was offered by the county commissioners, not for evidence against the perpetrators of the deed, whoever they might be, but for evidence leading to the conviction of the defendants. A public meeting of the citizens requested the State authorities to offer a like reward for evidence to convict the defendants. The newspaper articles, which must be considered to some extent a reflex of public opinion, are especially directed at defendants. It alleges that the defendant "Garcia was prevented from being lynched by the law and order loving people of the place, with the understanding from the sheriff that he would disobey the order of the judge of this circuit, and refuse to remove him." The newspaper quoted must have a strange standard as to what constitutes "law and order-loving people." People can not be affected with a high degree of love of law and order who only refrain from taking the law into their own hands upon extorting a promise from an officer of the law that he will disobey the writs of the court. These things could not have been done by "the law and order-loving people" of the community. This feeling is further evidenced by intimations in the article quoted that the defendant Garcia would be molested if he was acquitted, unless he left the city, and that there would be trouble if he were removed to another county for trial; also by allegations that defendants were guilty, and that the community knew it. This newspaper was no doubt influenced by worthy motives, a desire to see crime punished, and justice administered in the locality where the crime was committed. But the excess of its zeal, its dogmatic assertions of

the guilt of the defendants, and its inflamatory denunciations of them, are likely to bring about such a state of public sentiment as to defeat the very purpose intended.   In a similar recent case the Supreme Court of Oregon says:   "It is extremely unfortunate to the cause of justice that many of the newspapers of the country pursue the course they do with reference to cases of homicide.   They seldom fail to designate the transaction as a murder, which of itself is a judgment, to the extent of newspaper jurisdiction in such matters, that the slayor is guilty of that crime without regard to the circumstances connected with it. And they usually publish not only a detailed hearsay statement of the affair, but decidedly indicate their own views regarding it.   The result is, that by the time the accused is arraigned for trial, the reading portion of the community have generally formed and expressed an opinion concerning his guilt or innocence; which renders it very difficult to secure an intelligent and unbiased jury to try him by.   In the case under consideration, the newspapers referred to in the appellant's petition to postpone the trial, and for a change of venue, assume, I should judge from the tenor of the articles made exhibits, to decide how the case should be disposed of.   The publishers of those · sheets appeared to have established a tribunal of their own in which to try the accused; and in view of the extensive circulation of those papers, and their high standing as public journals, it is difficult to conceive how an impartial jury could be secured from the county where they are published, by which he could be tried, especially after two trials had already been had."   State v. Olds, 19 Oregon, 397, text page 429.

Before disposing of this branch of the case we think it but fair to the Circuit Judge who presided below to

say that we have determined the case upon the record before us. As a matter of course we could not have done anything else. The counsel for the State in his brief says that other testimony besides that shown by the record was before the court below when it denied the motion for a change of venue. He states that such testimony has been brought up in a supplement to the record filed here upon a return to a *certiorari* issued upon a suggestion of a diminution of the record by the State. No such suggestion or return is found in the record here. We find among the papers, but not filed, nor shown to be here by any authority, a certified copy of some papers sent here by the Clerk of the Circuit Court. They do not appear to have been filed in this case in the court below. They are no part of the record, and of course we can not consider them. If the statement of the States counsel is correct, that other evidence was before the judge below besides that brought up in the record, somebody is seriously in fault in not seeing that a proper record was brought for our inspection.

Our views upon the ruling of the court refusing the change of venue disposes of the writ of error, but as the case goes back for a new trial, and by so doing we may prevent future errors, we notice some other points presented by the record.

The 18th and 19th assignments of error arise from the following action of the Circuit Court, as shown by the record. During the examination of Joseph P. Salas, a witness for the State, counsel for the State moved the court "that an examination of the premises be had, and that this witness (Salas) be allowed to testify on the premises of this bar room, and that the jury attend, in order that they may understand the situation there better." Counsel for the defendants

objected to this motion upon several grounds, but the motion was granted by the court, and the court ordered the jury to go to the premises described by the said witness, that he might there continue his testimony. The defendants excepted to this ruling. Then the court, the jury, the prisoners, the counsel in the case and the witness Salas, and the stenographer proceeded to the premises known as Garcia's bar room. At this bar room the witness Salas was examined further and testified at length. Then the defendants made a motion for the jury to view the premises where the body was found. This motion was granted, and the court, counsel, defendants, witnesses and stenographer proceeded to another place where the body of the deceased was shown to have been found, and after an examination of witnesses at this latter place, all returned to the court room. This unusual proceeding was supposed to be authorized by the statute (R. S. 2918). This section, which is probably the shortest in the Revised Statutes, reads as follows: "The court may order a view by the jury." The only other provision upon the subject is Section 1087 R. S., but it seems to be applicable only to civil cases. In its form the motion upon the part of the State was certainly objectionable. It did not ask for a view of the premises, but that "an examination of the same be had, and that the witness be allowed to testify on the premises." The order of the court directed that "the witness might continue his testimony at the bar room of Garcia." This was practically a removal of a portion of the trial to the bar room; and the further motion of defendant removed another portion of the same to the place where the body of Mira was found. The proper place for the holding of court and the trial of criminal cases is the court house, when there is one in the

:334 SUPREME COURT.

·Garcia, Rodriguez and Sans v. State of Florida.—Opinion of Court.

county for which the court is being held. Hayward vs. Knapp, 22 Minn., 5, text page 7. It should not be removed to any other place except by express legislative authority. This question of a view of the premises where a crime is alleged to have been committed is a very difficult one. There is a remarkable scarcity of precedents upon the point, and the practice seems to have been unknown to the common law. A view of the premises in a criminal case can not be had at all except by express statutory authority. Smith vs. State, 42 Texas. 444; 1 Thompson on Trials, secs. 885, 881 and authorities cited. In a number of states where the statute provides for a view of the premises upon which a crime was committed, the manner of making the view is set out. All of them which have come to ·our knowledge provide that no one shall speak to the jury about the matter of their investigation while engaged in the performance of such duties. Some provide for an officer, and some other person familiar with the localities, to simply point out to the jury the places about which testimony has been taken. People vs. Bonney, 19 Cal., 426; People vs. Green, 53 Cal., ·60. Our statute is so meager that it furnishes no guide to the manner of making the view permitted by it. In the absence of any statutory provision, or rule of court, if a view of the premises is ordered, it should be a *view* pure and simple. No examination of witnesses should be had outside of the court room. The statute being one in relation to criminal proceedings, should be strictly construed. There is some conflict of authority as to whether it is necessary for the defendants to be present on such occasions. It can, however, be said that their presence, if not necessary, is not improper. The safest course is to have them present. Thompson on Trials, secs. 886, 887. The proper rule,

we think, has been laid down thus in Dowd vs. Guthrie, 13 Bradw. (Ill), 653: "In the absence of legislative provisions, describing the mode in which jury views are to be conducted, the court is of the opinion that it is more in consonance with the theory and methods of judicial trials that the jury should base their findings solely upon sworn testimony in open court, or by depositions taken as provided by law." We have, after considerable search, been unable to find a case in which examinations of witnesses have been permitted before the jury while away from the court house engaged in taking a view. The Supreme Court of Massachusetts seems, by implication at least, to have entertained the same view of the case that we have just announced. That State has a statute very similar to ours. The exact language of their statute is: "The court may order a view by a jury empanneled to try a criminal case." In the celebrated trial of Prof. Webster for the murder of Dr. Parkman the court upon application upon the part of the State for a view by the jury of the premises where the murder was alleged to have been committed, said that it had no doubt of its authority under the above statute to grant such view if deemed expedient. On adjourning for the day "the court directed that the jury should be permitted to take a view of the medical college on the next morning before the coming in of the court, attended by two officers and one counsel on each side." This proceeding was upheld in the appellate court. 1 Thompson on Trials, sec. 885; Commonwealth vs. Webster, 5 Cush., 295, S. C. 52 Am. Dec., 711. Further than was done in the Massachusetts case, we apprehend that the extent to which the court should go, beyond directing a mere view of the premises, is to send some person to be agreed upon by the parties, or appointed by the

court to go with the jury, and point out the premises to them. This was the practice under ancient English statutes in real actions, and the brevity of our statute implies that the Legislature intended to extend the civil "view" to criminal cases.

The defendants offered evidence which tended to prove an *alibi* for some of them. Their counsel in presenting the case to the jury stated that such evidence was not intended to prove an *alibi*, but to contradict the statements of some of the State's witnesses. The court charged upon the subject of *alibi*. The defendants' counsel excepted on the ground that as they had disclaimed any intention to prove an *alibi*, that the court should not charge at all upon that subject. We do not assent to this view. The court should charge the jury upon the law as applicable to the evidence given by the witnesses. It is not bound to accept the construction placed upon such evidence by counsel. Of course the court should not state that the defendants offer proof of *alibi*, when only two of them do so, but should make the language of his instructions to the jury correspond with the facts of the case.

An assignment of error is taken upon the following charge given by the court below, *viz:* "Where an *alibi* is set up, the burden of proof is on the defendants. But the defendant or defendants are not bound to prove it beyond a reasonable doubt; but if the evidence offered by the defendants or either of them to establish an *alibi*, taken in connection with all the testimony in the case, raises a reasonable doubt in your minds of the presence of the defendants, or either of them, at the commission of the crime, then it will be your duty to acquit all or such of the defendants as you so believe not to have been present at the commission of the

crime." The latter part of this charge is misleading and objectionable. In any future trial the latter portion reading thus: "as you so believe not to have been present at the commission of the crime," should be omitted. In their place should be the words "to whom such reasonable doubt applies." Murphy vs. State, 31 Fla., 166, 12 South. Rep., 453.

The judgment of the Circuit Court is reversed and a new trial awarded.

MABRY, J.: (Concurring).

The record before us shows affirmatively that three applications for a change of venue of the case were made and refused, one at the June term, 1893, one at the Fall term in November, 1893, and another at the Spring term, 1894. At the last term mentioned it appears that the accused were convicted, and the writ of error now before us is from the sentence imposed on them after conviction. The bill of exceptions in the record contains the proceedings at the trial at the Spring term, 1894, and it shows that affidavits made on former applications, for change of venue were refiled on the renewal of the application in 1894, and also that new affidavits were then filed. Among the new ones filed are affidavits of affiants in the refiled affidavits made on former applications for a change of venue, to the effect that the statements therein contained are still true and applicable to said cause as when they were made. Giving due consideration to all the affidavits before the court on the application in 1894, as

shown by the record before us, I think the court should have granted a change of venue, and I concur in the conclusion that the refusal of the court to order the venue changed was error. I concur also in the conclusions on the other points.