141 So.2d 264 (1962)
Leland Roy BAUGUS; Nicholas Joseph Sikalis, also known as Joseph Patrick Hayes, Appellants,
v.
THE STATE OF FLORIDA, Appellee.
No. 31487.
Supreme Court of Florida.
May 9, 1962.
Rehearing Denied June 5, 1962.
*265 Jos. P. Manners and Harry Willis, Miami, for appellants.
Richard W. Ervin, Atty. Gen., and George R. Georgieff, Asst. Atty. Gen., for appellee.
THOMAS, Justice.
Again we face the awful responsibility of determining whether or not a judgment of guilty and consequent sentence to death should receive the imprimatur of this court. It seems fitting, at the outset to observe that no challenge of the sufficiency of the evidence to support the basic finding of guilt has been presented by appellants either in the brief lodged with this court, or in the oral argument which the court has heard unhurriedly. On the contrary the appellants through their counsel take the position that the proof of guilt was overwhelming.
Even so we have, in adherence to the duty placed on us by Section 924.32, Florida Statutes 1959, F.S.A., reviewed the evidence to determine if the interests of justice require a new trial though the insufficiency of the evidence is not made a ground of appeal.
A study of the evidence and, for that matter the entire record, leads unfailingly to the conviction that the appellants deliberately and designedly killed a man to take his purse.
The facts are comparatively simple. Appellant Baugus, age 18, and his 16-year old wife went to Miami evidently on an idle excursion. There they came in contact with appellant Sikalis, also known as Hayes, who with his mistress was sojourning in Miami. The parties had known one another before. A session at a dog track depleted the finances of the four and in their necessity they decided to "roll" someone whom they would undertake to locate in a bar and lure to a secluded spot.
It was first planned that the mistress, who was the older of the women, would go to a barroom, toll a male customer into an alley where Baugus, lying in wait, would assault him and take his money to replenish the group's funds. Bar and alley were selected *266 but the plan failed when the woman either acquired a "mickey finn" or went down the wrong alley, or both. Then Baugus and the woman and Sikalis, who seems to have been the master planner and who had been hovering nearby, returned to the hotel room to get a fresh start.
It was ultimately decided that the younger woman would act as the decoy so she donned the dress of the older woman and she and the two men set out for the nearby bar and alley. While Sikalis hung about and Baugus waited to assault the victim, the young wife found a seat on a stool in the bar next to one occupied by one Rudi Plauck whom she soon lured into the darkened alleyway. Baugus descended on him, beat him about the head with a club 17 inches long and one and one-half inches thick, searched his pockets and withdrew to the street. When he rejoined his wife and told her how much money he had got, she said Plauck had more than that so he returned to the alley where Plauck was on his knees in an attempt to stand. Thereupon Baugus administered the coup de grace, took the rest of the man's money, returned to his wife and Sikalis, and all went to the hotel room where the loot was divided. Several hours later Plauck succumbed to his wounds.
That, in our view, was a classic example of murder in the first degree. So the jury found, and the judge, too, when he entered the judgment and pronounced the sentence.
We have already said that a careful examination of the record does not indicate that the ends of justice require a new trial bearing in mind the stark facts we have just outlined.
But the appellants contend that in the process of the trial things occurred which could well have justified the jury in recommending mercy and thereby automatically reducing the penalty to life imprisonment.
It is difficult to relate the points raised or the rulings on which they are based to the contention that although the appellants were shown to be guilty of murder committed during a robbery they were nonetheless entitled to mercy at the hands of the jury because that feature of the case is so nebulous as to be incapable of definition. The judge charged the jury simply, and quite properly, that in the event either, or both, of the defendants should be found guilty of murder in the first degree, a majority of the jurors could recommend mercy in which case the penalty would be life imprisonment instead of electrocution. The statute on the subject is no more explicit or helpful than that. It provides, Sec. 919.23, Florida Statutes 1959, F.S.A., that one found guilty of a capital offense and recommended to mercy by a majority of the jury shall be sentenced to imprisonment for life. That is all. So the matter of reduction of the sentence by vote of the jury is one to be determined purely by the dictates of the consciences of the individual jurors. We would hesitate to determine from the cold type of the record whether or not the state of the consciences of the jurors was such that a recommendation of mercy should have followed the verdict of guilty because, as we said in Bennett v. Jacksonville Expressway Authority, Fla., 131 So.2d 740, conscience is the "`ideas and feelings within a person * * *, [his] consciousness; inmost thought [and] mind * * *.'" But there is no occasion to pursue this aspect further since this court is empowered only to reduce the degree of an offense under Sec. 924.34, Florida Statutes 1959, F.S.A., and the immediate question is not one involving degree of the crime but only degree of punishment in accordance with a recommendation of seven jurors as distinguished from a verdict of twelve.
We, therefore, approach the questions posed by the appellants who urge that answers favorable to them should result in a new trial at which, presumably, they could *267 obtain a verdict at least carrying with it the coveted recommendation.
First, we are entreated to disapprove the judge's denial of appellants' motion to have made and delivered to them a transcript of all the testimony taken at the preliminary hearing. They insist that such should have been made available because of the provisions of Section 1 of the Declaration of Rights of the Florida Constitution, F.S.A. securing to all men the inalienable right to defend life and liberty, and Section 12 guaranteeing that "no person shall be * * deprived of life, liberty * * * without due process of law."
To begin, the procedure of hearing a case preliminarily is not a step in due process of law, is not a prerequisite to a criminal prosecution or the filing of an indictment. It serves only to determine whether or not probable cause exists to hold a person for trial, Rouse v. State, 44 Fla. 148, 32 So. 784; Di Bona v. State, Fla.App., 121 So.2d 192, and a prosecution may be instituted and maintained regardless of such an investigation.
The statute on the subject, Sec. 902.11, Florida Statutes 1959, F.S.A., can offer no comfort to the appellants. It was plainly designed to give the State no advantage by possessing the transcript of testimony adduced at a preliminary hearing when the defendant had none but it cannot be construed as securing such a record to a defendant unless the State has had the transcript made. It provides that upon request of the prosecuting officer the testimony "shall either be reduced to writing by the magistrate, or under his direction, or * * taken in shorthand * * * and transcribed." And if it is reduced to writing at the prosecutor's request, a copy must be furnished to the defendant without charge.
In this case no such request was made so the transcript was not put in the hands of the prosecutor to the defendants' disadvantage. Doubtless the defendants could have secured the transcript by paying the cost, but there was no obligation on the part of the State to have it prepared simply because the defendants wished it free in order "properly [to] prepare their defense."
The appellants criticize a statement made by the trial judge during the examination of the jurors on the voir dire. Paraphrased, he told them that some jurors formed a habit of saying they were conscientiously opposed to capital punishment just to escape service on a jury trying a capital case. He warned that such a method in the instant prosecution would be of no relief to any juror thus inclined because he had arranged with one of his colleagues who was trying civil cases during the week to take all jurors excused because of conscientious objection to the infliction of capital punishment, which would mean that such jurors would serve a full week's service in civil actions instead of the relatively short time which would be required for trial of the immediate case.
The appellants insist that the remarks of the trial judge in this regard indicated he "strongly" favored capital punishment and felt the defendants deserved such a sentence. They cite in support of their argument opinions condemning expressions of judges indicating their views of the case or character of the evidence. Raulerson v. State, Fla., 102 So.2d 281.
We cannot find in the judge's observations the objectionable features claimed by the appellants. Of course, no testimony had been introduced and we cannot construe the remarks as indicating whether the judge, himself, did or did not believe in capital punishment.
The language was plainly calculated to discourage a juror from using pretended conscientious scruples against the death penalty as a subterfuge to escape service on a jury in a murder case. But it seems to us that no harm could have come to the appellants for a juror with opinions somewhat averse to the extreme penalty would have gone into the jury room at the close of the *268 evidence with an inclination, at least, to join in recommending mercy. He could be contrasted with the juror who entertained no scruples whatever against such punishment. A look at the law on the subject, Sec. 932.20, throws some light on this aspect. It disallows service on a jury trying a capital case by one "whose opinions are such as to preclude him from finding any defendant guilty of an offense punishable with death * * *." (Italics supplied.)
The appellants question the propriety of five photographs introduced in evidence. The first of these depicted the body of Plauck covered with a sheet up to the neck and with a white cloth over the eyes. Two persons appeared in the picture, the wife of the deceased and the medical examiner. We interpolate that when Plauck was found in the alley the officer who answered a summon to the place could find upon him no means of identification, and, according to the statements in appellants' brief it was "by means of [this] photograph" that the wife of the victim had identified him. Furthermore, it is stated in the brief that the picture "in and by itself was unnecessary to the prosecution * * * as at the time of introduction * * *, the only materiality it had was to establish the identity of the deceased."
These concessions are in themselves sufficient to establish materiality which would justify exhibiting the picture to the jury. And the picture itself depicted nothing that could be called gruesome or gory. In Lindberg et al. v. State, 134 Fla. 786, 184 So. 662; Mardorff v. State, 143 Fla. 64, 196 So. 625; Dyken v. State, Fla., 89 So.2d 866; Leach v. State, Fla., 132 So.2d 329, we discussed the admissibility of photographs, when shown to be material even though revolting. There is no need to elaborate on this subject because there is nothing in this picture or in the other four that would have had a tendency to arouse the jury against the defendants.
Of the four remaining pictures, two were taken from the center of the alley portraying it in opposite directions, one showed the spot where Plauck fell and one described Baugus pointing to the club he used to dispatch Plauck. We find no error in the ruling that they could be considered by the jury.
The appellants next complain about the search without a warrant of one of the two rooms in a hotel in Miami Beach to which the foursome fled when they read in a Miami newspaper about the plight of Plauck. A detective from the Miami Police Department went to the room, No. 334, and there found the club used by Baugus who was not present at the time but who entered while the detective was there and, according to the officer, consented to the search.
It is the appellants' contention that the Bauguses were occupying room 335 and the other couple room 334; that although Baugus had signed a waiver of objection to search room 335 which was, with his consent amended to include room 334, he had no such authority. But the mistress of Sikalis who occupied the room with him gave her consent to search their quarters. There is evidence that the detective who made the search of Sikalis's room thought it was the room of Baugus, but even if there was a search of Sikalis's room on the belief it was Baugus's, it should be borne in mind that we do not have to deal with the question whether or not a wife can consent to a search of her husband's property for the woman who shared the room with Sikalis could not be dignified as a wife. They were two persons using the same property and either of them could authorize the search, and it further should not be forgot that in the whole plan the woman, as well as Sikalis and Baugus, was a participant.
Were we to sustain the appellants on this point, the result would, we believe, be incongruous. Four persons plot a robbery in Miami. They become fugitives and flee to Miami Beach where they occupy two rooms at a hotel, one, presumably, by the *269 leader and his paramour, one by a man and his wife who are accomplices. The police make a search and find the murder weapon. Because it was discovered in a room occupied by the leader who did not agree to the search, although the man who wielded it and the woman who occupied the room with the leader agreed to the search, we are asked to reverse the judgment even though the evidence of guilt is admittedly overwhelming, on the tenuous plea that a new trial might result in a recommendation of mercy.
We reject the plea. We think the consent was valid. The man and woman who occupied the room where the murder weapon was found used the place as individuals, not as husband and wife, and the agreement on the part of one to search was sufficient, not to mention the consent by the confederate who was so agreeable that he suffered his picture to be taken as he pointed to the club he used to kill Plauck. See Stein et al. v. United States, 9 Cir., 166 F.2d 851, certiorari denied 334 U.S. 844, 68 S.Ct. 1512, 92 L.Ed. 1768; United States v. Sferas (United States v. Skally), 7 Cir., 210 F.2d 69, certiorari denied 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086.
The next to last question is in the form of a challenge to the charges of the trial judge on the theory that he stressed unduly the definition of murder in the first degree. A close reading of the record convinces us this claim is devoid of merit. Some of the repetition occurred when the jury asked for further instruction and it is noteworthy that the judge repeated also the charge he had given with reference to recommending mercy. It is obvious to us that the trial judge patiently, thoroughly, and meticulously conducted the trial so that the appellants would receive a full measure of justice.
The final charge is that justice went astray when the assistant state attorney referred to the defendants as young hoodlums and added "that is what the F.B.I. calls them." We cannot construe the remarks as meaning that these very defendants had been characterized as hoodlums by the Federal Bureau of Investigation but that in the opinion of the speaker they had by their manner of operation earned the colloquial title and the Federal Agency had thus categorized such persons. We might observe that the only definition of hoodlum available to us is "young rowdy" or "street ruffian" and these seem rather mild when applied to persons who engage in `hoodlumism' to the extent of murdering for gain.
We are aware of no reason to upset the judgment and sentence.
Affirmed.
ROBERTS, C.J., and DREW, THORNAL and O'CONNELL, JJ., and WALKER, Circuit Judge, concur.
HOBSON, (Ret.) J., not participating because of illness.