177 So.2d 845 (1965)
McArthur MYRICK, Appellant,
v.
STATE of Florida, Appellee.
No. G-77.
District Court of Appeal of Florida. First District.
August 5, 1965.
Rehearing Denied September 8, 1965.
*846 T. Edward Austin, Jr., Public Defender, for appellant.
Earl Faircloth, Atty. Gen., and James G. Mahorner, Asst. Atty. Gen., for appellee.
RAWLS, Chief Judge.
Myrick appeals a judgment of guilty of breaking and entering with intent to commit a misdemeanor and petit larceny.
Defendant was informed against for breaking and entering Van A. Copeland's automobile which was parked in the Springfield residential section of Jacksonville on February 26, 1964 and stealing a .380 Beretta pistol and clip. On prior occasions, the *847 police had received numerous calls concerning breaking and entering cars in the Springfield area. On Sunday, March 1, 1964 about 9:30 or 10:00 P.M. a police car was cruising the area without lights when Officer Nicholson and his partner spotted a figure wearing what appeared to be a Navy watch cap and a three-quarter coat. As the unlighted car approached, the person ran. The officers gave pursuit on foot. A gun battle followed, and when McArthur Myrick, a colored boy age 19, became wounded he was apprehended and taken to Duval Medical Center. The weapon he used in the gun battle was Copeland's .380 Beretta pistol. Two screwdrivers were also found in his possession.
A proffer made to the court out of the presence of the jury revealed that about an hour after the gun battle four police officers went to the home of Herbert and Roberta Culver. Roberta was Myrick's sister with whom he lived. There were twin beds in Myrick's room and Herbert Culver shared the room with him while Roberta and the children slept in the other bedroom. The house was rented by the Culvers. According to the testimony of the several officers who conducted the search, they were invited into the house, and upon request, Herbert Culver took them to the room Myrick occupied. There they found two brief cases filled with electric shavers, small radios, etc. The testimony of the Culvers contradicted that of the officers, but it was so fraught with other discrepancies such as the number of officers, the way they were dressed, and the doors by which they entered, that the trial judge could have found that it was not susceptible of belief.
The trial judge denied the motion to suppress evidence and held (1) that the evidence obtained by the search, without a warrant, could be introduced on the principle that where two persons have equal rights to use and occupancy, either may give permission to search, and (2) evidence of collateral crimes could be introduced, when tied to the articles found in Myrick's room, on the theory of a common scheme.
Officer Tillman testified that on March 3, 1964, he visited Myrick in the hospital at about 10:00 A.M. Myrick appeared physically weak but mentally alert when he freely and voluntarily answered questions. He stated that he didn't break into houses, but had broken into about 15 cars. He further stated that the stolen items were at his sister's house and if Tillman would go there, his sister would give them to him. He recalled that the gun came from a Cadillac a few days before the gun battle. Myrick was under arrest at this time, had not been before a magistrate, did not have an attorney, did not request an attorney, and was not informed that anything he said could be used against him. Present at this time were several people in the ward  the other patients, a nurse and a guard. About 4:00 o'clock that afternoon Myrick talked to another officer and told him substantially the same things.
The defendant testified that he was weak and was receiving three shots a day for pain at the time he talked with the officers. He denied telling them that he broke into cars, but quoted parts of the conversation he had with the officers relative to his not breaking into houses. The trial judge concluded that the confessions were given voluntarily and permitted them in evidence with proper instruction to the jury.
At the trial Copeland identified his pistol and testified as to facts relative to the theft of same. Two other witnesses identified items which had been found in Myrick's room as those taken from their locked automobiles while parked in the Springfield section of town.
Myrick denied that he had stolen the pistol. He testified that he purchased it several days before, had hidden it in the yard of an unoccupied house in Springfield and had gone to get it the night of the gun battle. He stated that the pistol discharged accidentally.
*848 Appellant's first point concerns whether the lower court erred in denying his motion to suppress the evidence obtained by the search without a warrant.
There was uncontradicted evidence that Herbert Culver rented the house and slept in the room searched. There was substantial competent evidence that Culver voluntarily showed the officers to the room for the purpose of making a search. The Florida Supreme Court has held that an agent, who is in charge, may consent to the search of his principal's office,[1] that defendant's father, who owns the home may give permission to search defendant's room[2] and that defendant's mistress, who occupied the hotel room with him, could authorize a search.[3] In accord with these authorities, Herbert Culver, who rented the house and slept in the room, could consent to the search especially since he admittedly did not object to the search and did not ask for a search warrant. We find that this evidence when taken as a whole meets the clear and convincing character of the evidence test which is required for a finding of consent to search.[4] Mere conflict of evidence does not preclude a finding that consent was freely and voluntarily given.[5]
Appellant's second point questioned the trial court's finding that the confessions were voluntarily given. Appellant first contends that at the time of making the alleged confessions his physical and mental condition rendered him incapable of exercising free will sufficient to appreciate the significance of any statements he may have made. Appellant relies upon Reddish v. State[6] where defendant was in a severe state of shock, had received three blood transfusions and was under the influence of the drug demerol. In the instant case the State's proofs made a prima facie case showing that although the defendant was physically weak, he was mentally alert. It then became the duty of the accused who denied the voluntariness of the confession to go forward with the evidence. In doing so the defendant himself testified that he was extremely weak. He denied making certain statements but he recalled his conversation with the officers, related the events, and even quoted statements made at the time. The record indicates that the trial court's ruling of admissibility was based in part upon the defendant's own testimony. We find the appellant's contention on this point to be without merit.
Appellant next contends that although he did not request counsel, the confessions are inadmissible in evidence since the state failed to show that he intelligently waived counsel before he gave the confession. Appellant relies upon the combined effect of Gideon v. Wainwright[7] and Escobedo v. State of Illinois.[8]
In Montgomery v. State,[9] our Supreme Court in construing Gideon reiterated that the "due process" requirement imposed upon the states by the dual impact of the Fourteenth and Sixth Amendments to the Federal Constitution requires that an accused be assisted by counsel at every *849 critical stage of a felony prosecution unless such assistance is properly waived. The defendant in Montgomery, as did the defendant here, gave what was judicially determined to be a voluntary extra-judicial confession within a short time after being arrested, and prior to being represented by counsel. The Supreme Court in rejecting the applicability of Gideon in Montgomery observed that the investigative processes are not part of the criminal prosecution to which the constitutional guaranty there set out can attach. We reach the same conclusion here.
The question presented to the United States Supreme Court in the Escobedo case was, "whether, under the circumstances, the refusal by the police to honor petitioner's request to consult with his lawyer during the course of an interrogation constitutes a denial of `the Assistance of Counsel' in violation of the Sixth Amendment * * * and thereby renders inadmissible in a state criminal trial any incriminating statement elicited by the police during the interrogation." The majority opinion carefully discussed each of the following controlling facts and held:
"* * * that where, as here, [1] the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, [2] the suspect has been taken into police custody, [3] the police carry out a process of interrogations that lends itself to eliciting incriminating statements, [4] the suspect has requested and been denied an opportunity to consult with his lawyer, [5] and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied `the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as `made obligatory upon the States by the Fourteenth Amendment' * * * and that no statement elicited by the police during the interrogation may be used against him at a criminal trial."
Mr. Justice White's dissent in the Escobedo case stated:
"In Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199 [12 L.Ed.2d 246], the Court held that as of the date of the indictment the prosecution is disentitled to secure admissions from the accused. The Court now moves that date back to the time when the prosecution begins to `focus' on the accused. Although the opinion purports to be limited to the facts of this case, it would be naive to think that the new constitutional right announced will depend upon whether the accused has retained his own counsel, * * * or has asked to consult with counsel in the course of interrogation."
We are not in the instant case controlled by the dissenting opinion, however accurate may be Mr. Justice White's predictions of the future actions of the United States Supreme Court. The fact remains that the Escobedo majority opinion is explicitly limited to the facts of that case, and the principle announced therein involves the criteria for determining whether an accused is deprived of his right to counsel by the state's refusal to grant his request to consult with his counsel. Since no such request or refusal was involved in the case sub judice, the principle in that case is not controlling here. As noted above, a similar conclusion was reached by the Florida Supreme Court in Montgomery v. State,[10] which contained a factual situation comparable to that in the instant case. The contention urged and rejected there was that the failure of the police to effectively warn appellant of his right to remain silent rendered the confession inadmissible under the Escobedo case.
More pertinent to this decision is the United States Supreme Court's opinion in *850 Jackson v. Denno,[11] decided the same day as the Escobedo case and involving a factual situation very similar to that in the instant case. On June 14, 1960, sometime after 1 A.M. Jackson engaged in a gun battle with police. Although he was shot in the liver and lung, he managed to escape and hail a cab which took him to the hospital. Soon after his arrival, about 2 A.M. and while being question, he confessed to a detective who described his condition as "strong" despite his wounds. At 3:55 A.M. Jackson was given 50 milligrams of demerol and 1/50 of a grain of scopolamine and immediately thereafter was again questioned. The interrogation was recorded by a stenographer and lasted only five minutes, but at that time Jackson had lost about 500 cc. of blood. One hour later Jackson underwent a 3 hour operation. At the time of the trial Jackson could remember the interrogation but could not remember the questions or the answers. The United States Supreme Court held the New York procedure (of letting the jury at the trial determine the voluntariness of a confession) unconstitutional and remanded the cause to the New York courts for a new determination of that issue. In so doing, the majority opinion referred to that type of procedure under which the trial judge himself solely and finally determines the voluntariness of the confession as the "orthodox" procedure. This reversal of the New York case was an expression of approval by the United States Supreme Court for that procedure which has long been the rule in Florida and which was correctly followed in the instant case.
It is interesting to note that the facts in the Jackson case are strikingly similar to those here involved, and the United States Supreme Court held that if Jackson's confessions were found to be free and voluntarily given, he should not be granted a new trial.
Extra-judicial confessions are admissible in evidence when the trial judge after a thorough investigation into all the surrounding circumstances determines that it was in fact freely and voluntarily given. Once introduced it is the duty of the jury to determine the credence which should be attached to the confession. This procedure was properly followed, and considering the totality of all the circumstances, there was sufficient evidence to justify the trial judge's finding. There was no evidence that the confession was coerced, resulted from ill treatment by police officers, was engendered by hope, fear, duress, intimidation, or fraud, was induced by any promises of reward or immunity, was secured by any psychological overpowering activities on the part of the police, was the result of a lengthy interrogation, or was anything but a free choice of expression on the part of the defendant.[12] The fact that the police fail to warn an accused that he may remain silent and that anything he says may be used against him, is an element which the trial judge must consider, but that fact does not, of itself, render the confession inadmissible.[13]
Having failed to find that the appellant was prejudiced in any way or that his trial was conducted in any manner other than with that fundamental fairness essential to the very concept of justice, we
Affirm.
CARROLL, DONALD K., J., and SMITH, SAMUEL S., Associate Judge, concur.
NOTES
[1] Fuller v. State, 159 Fla. 200, 31 So.2d 259 (1947).
[2] Tomlinson v. State, 129 Fla. 658, 176 So. 543 (1937).
[3] Baugus v. State, 141 So.2d 264 (Fla. 1962), Cert. denied 371 U.S. 879, 83 S.Ct. 153, 9 L.Ed.2d 117.
[4] Sagonias v. State, 89 So.2d 252 (Fla. 1956).
[5] Jackson v. State, 132 So.2d 596 (Fla. 1961).
[6] Reddish v. State, 167 So.2d 858 (Fla. 1964).
[7] Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733 (1963).
[8] Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).
[9] Montgomery v. State, Fla., 176 So.2d 331, Opinion filed June 9, 1965.
[10] Montgomery v. State, supra.
[11] Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).
[12] See 13 Fla.Jur., Evidence §§ 248-263; Leach v. State, 132 So.2d 329 (Fla. 1961); Williams v. State, 156 Fla. 300, 22 So.2d 821 (1945); and 1 L.Ed.2d 1741, Anno: Admissibility of confession.
[13] Montgomery v. State, supra.