LEIGH M. CLARK, Retired Circuit Judge.
A jury found appellant guilty of robbery. The court fixed his punishment at imprisonment for twenty years and sentenced him accordingly.
Ms. Pam Smithson testified that she was the night auditor for the Rodeway Inn in Tuscaloosa and that about 1:30 A.M. April 27,1978, someone knocked at the door. She unlocked the door and admitted a black male, who, as she returned to the counter, pointed a gun at her, which appeared to be a rifle. He told her to “give it up.” She took the cash drawer out and handed him the currency, which amounted to approximately two hundred and sixteen dollars. The robber promptly left the premises, and then Ms. Smithson called the police, to whom she related the incident upon their arrival. Later in the morning, the police returned with two shirts; she identified one of them as the one worn by the robber. Still later the same morning the police brought three black males to the Rodeway Inn, and presented them one at a time to her for her identification of one of them as the robber. She was unable to identify anyone of them. She said that appellant was not the robber.
Larry Gordon was called as a witness by the State and testified that he was the robber. According to him, he and Tommy Sommerville were together most of the time from about nine or ten o’clock the morning before the robbery until they were arrested a few hours after the robbery. He and appellant went to Curtis Boyd’s house. Gordon, appellant, and Boyd and two other men traveled in Boyd’s automobile, a brown ’73 Vega Hatchback. They indulged in considerable drinking and eating. Boyd drove most of the way to Livingston. As or after they made the return trip to Tuscaloosa, the other two men did not accompany Gordon, Boyd and appellant.
According to the further testimony of Gordon, he, appellant and Boyd planned to go to Chattanooga, Tennessee, and discussed such prospective trip. He mentioned to appellant, while appellant was driving the automobile, that they needed to get some money for the trip by “pulling a job.” The car was stopped at a motel in North-port where Gordon got out of the automobile, which appellant was driving, but soon returned to the automobile and told appellant that the motel was not a good place for them. It seems that Boyd was in the back seat of the automobile drunk and asleep during most of the time that Gordon and appellant were riding in the automobile in Tuscaloosa and Northport. Gordon testified that when he told appellant that they needed “to pull a job,” appellant’s only response was, “Yeah, I know.”
*1209 Larry Gordon testified also that after he and the others returned from Livingston to Tuscaloosa, he obtained the carbine used in the robbery from appellant’s home, where the witness had previously left it, and placed the carbine in the hatchback of the Vega automobile, and that after the robbery he again placed it there. He said:
“After we rode about- two blocks, we went to an apartment complex, sat there about five minutes and split the money up and left.”
He said that thereafter they went to the Stardust Motel, filled the car with gas, went to Boyd’s home, sat around there for about thirty minutes, left there and went to a Zippy Mart, and upon leaving there they were stopped by the police. He was riding in the front seat with defendant at the time.
According to the testimony of officers, called as witnesses by the State, they went to the Rodeway Inn soon after they were called, obtained a description of the robber and the vehicle involved, and in looking for the vehicle and its occupants, one of them saw a brown Vega at the intersection of Skyland and McFarland Boulevards, with three black males in it. After obtaining a backup, the officers stopped the automobile. Appellant was driving it, Gordon was in the front seat and Boyd was in the rear seat. The carbine was in the back of the Vega. The three were then taken to the Rodeway Inn and thereafter to the police station. Upon searching appellant while at the police station, currency in the amount of ninety-seven dollars was found in the end of one of his socks. No weapon was found on him.
When the State rested, the defendant rested also.
There is no contest between appellant and appellee as to the sufficiency of Gordon’s testimony to show that appellant was a participant, as an accomplice of Gordon, in committing the robbery. Appellant says, however, that the testimony of Gordon as to appellant’s participation is not corroborated. He relies upon what is stated in 2 Wharton, Criminal Evidence, § 752 (11th ed.):
“. . . [T]he proper test in determining whether there was sufficient corroboration of the testimony of an accomplice, according to statutory requirements, is first to eliminate the evidence of the accomplice and then, if upon examination of all the other evidence there is sufficient inculpatory evidence tending to connect the defendant with the commission of the offense, there is.sufficient corroboration.”
This test was applied in Sorrell v. State, 249 Ala. 292, 31 So.2d 82 (1947); King v. State, 44 Ala.App. 119, 203 So.2d 466 (1967), as well as in other cases. The statement does not mean that the evidence from which the testimony of the accomplice is eliminated must be so strong as to uphold a conviction. If the evidence, separate and apart from the testimony of the accomplice, constitutes “sufficient inculpatory evidence tending to connect the defendant with the commission of the offense” it is sufficient to constitute necessary corroboration. This principle is so stated in the authorities cited and in the provision of the Alabama statutory law on the subject. Code 1975, § 12-21-222.
Defendant’s motion to exclude the evidence was properly overruled.
The mother of Curtis Boyd testified on call of the State. She was the owner of the Vega automobile. She said that some time late at night on the night of the robbery Curtis, Gordon and defendant came into her house, that Gordon put on one of her son’s shirts after taking off the shirt Gordon had been wearing. He left the shirt at the home of the mother of Curtis Boyd. She identified the shirt that Gordon took off as the shirt that Pam Smithson testified the robber had on when he robbed her. There was much additional testimony by the witness, but we believe the foregoing is sufficient for an understanding of appellant’s insistence that the trial court should have granted his motion for a mistrial during the closing argument of counsel for the State, as shown by the following:
“MR. SHIELDS: Mr. Hardin says that Mrs. Boyd has an interest in this case. Her son is sitting in jail. He has already plead guilty to this offense.—
*1210 “MR. HARDIN: I object.
“THE COURT: I sustain the objection.
“MR. SHIELDS: Your Honor, I believe that was testified to.
“MR. HARDIN: May we approach the bench?
“THE COURT: Yes, sir.
“(The following occurred at the bench outside the hearing of the jury.)
“MR. HARDIN: We object to that and move for a mistrial on the basis of the statement of Mr. Shields.
“MR. SHIELDS: It’s in evidence Your Honor.
“MR. HARDIN: No, that he had an offer.
“(Back in the presence of the jury)
“THE COURT: The jury will disregard the statement made by Mr. Shields concerning Mr. Boyd.”
It appears that counsel for the State believed that the evidence showed that Curtis Boyd had pleaded guilty to the robbery, but the record shows that he was mistaken in that belief, and the court would have been in error if it had overruled defendant’s objection to the argument. However, the harmful effect of the argument was not ineradicable. For that reason the court would not have been justified in granting defendant’s motion for a mistrial. Donahoo v. State, Ala.Cr.App., 371 So.2d 68, cert. denied, Ala., 371 So.2d 74 (1979); Meredith v. State, Ala.Cr.App., 370 So.2d 1075, cert. denied, Ala., 370 So.2d 1079 (1979); Nix v. State, Ala.Cr.App., 370 So.2d 1115, cert. denied, Ala., 370 So.2d 1119 (1979). In Davis v. State, 36 Ala.App. 573, 62 So.2d 224 (1952), it was held that the argument of a prosecuting attorney that defendant’s brother had been convicted of the crime of which defendant was being tried as an accomplice, did not require a mistrial, and that the trial court was not in error in denying defendant’s motion for a mistrial in the light of its instruction to the jury to disregard the argument.
Appellant also complains of other argument of counsel for the State and the court’s overruling appellant’s objection to such argument:
“MR. SEALS: Its part of the code of hoodlums that they don’t rat on each other.
“MR. HARDIN: Your Honor, we are going to object to that being part of the code of hoodlums, there has been no testimony as to the code of hoodlums.
“THE COURT: Well, let’s move on, overruled.”
Appellant relies largely upon the opinion of Judge Godbold in Hall v. United States, 419 F.2d 582, (5th Cir. 1969) in which it was held improper for the government’s attorney to refer to defendant as a “hoodlum.” For the opinion and its author we have profound respect and look to the opinion in detail for guidance. We particularly note that the attorney was held to be out of line in five separate areas of his argument that led to a reversal of appellant’s conviction. Four of the areas were unrelated to the argument now under consideration. The court said as to the characterization of appellant as a “hoodlum” in Hall v. United States, supra, at 587:
“This type of short-hand characterization of an accused, not based on evidence, is especially likely to stick in the minds of the jury and influence its deliberations.
We agree that not all defendants in criminal cases, even defendants guilty of felonies involving moral turpitude, are hoodlums. Although the evidence in the case may preponderate against them as to their guilt, there may be no evidence to indicate that they are hoodlums. In such cases, the description of them as hoodlums constitutes an addition to the charge against which they are attempting to defend. Such, however, was not the case now under consideration.
As shown by some of the evidence narrated hereinabove, appellant, Gordon and Boyd, all three young men, were on the prowl for about a day, and more than half of the night, prior to the robbery. One was drunk a large part of the time in the back seat of the automobile his mother owned. The other two had been sufficed by con *1211 siderable drinking. They had gone from one county to another and planned to go to Tennessee. They had a gun in the automobile. They were looking for money and were prepared to take it by force. Was counsel justified in calling them hoodlums? We look for the answer in the most comprehensive definition to be found in any dictionary:

“Hoodlum. U.S. slang.

[The name originated in San Francisco in about 1870-72, and began to excite attention elsewhere in the U.S. about 1877, by which time its origin was lost, and many fictitious stories, concocted to account for it, were current in the newspapers. See a selection of these in Manchester (N.H.) N. & Q. Sept. 1883] A youthful street rowdy; ‘a loafing youth of mischievous proclivities’; a dangerous rough.” Oxford English Dictionary (1961).
We hold, as did the Supreme Court of Florida, in Baugus v. State, 141 So.2d 264, 269 (1962), cert. denied, 371 U.S. 879, 83 S.Ct. 153, 9 L.Ed.2d 117, in which it was said:
“The final charge is that justice went astray when the assistant state attorney referred to the defendants as young hoodlums and added ‘that is what the F.B.I. calls them.’ . . . We might observe that the only definition of hoodlum available to us is ‘young rowdy’ or ‘street ruffian’ and these seem rather mild when applied to persons who engage in ‘hoodlumism’ to the extent of murdering for gain.”
We find no error in the record and the judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of. the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.