180 So.2d 183 (1965)
John Scott DAMPIER, Appellant,
v.
STATE of Florida, Appellee.
Robert Lamar JOINER, Appellant,
v.
STATE of Florida, Appellee.
Nos. G-250, G-258.
District Court of Appeal of Florida. First District.
November 16, 1965.
R.A. Green, Jr., Public Defender, for appellants.
Earl Faircloth, Atty, Gen., and James G. Mahorner, Asst. Atty. Gen., for appellee.
*184 RAWLS, Chief Judge.
John Scott Dampier and Robert Lamar Joiner appeal from judgments of conviction of murder in the first degree and the ensuing life sentences. A third codefendant, Connie Dampier, wife of John Scott Dampier, was acquitted.
A couple of days before the murder Dampier and his wife, Connie Dampier, while driving East on U.S. 90 picked up Joiner, a hitchhiker, at "a little bitty town" between Pensacola and Marianna. From that point the three drove to Gainesville, Florida, where the Dampiers had on a prior occasion dived in a rented trailer located back of R.T. Culpepper's store. During their journey the threesome stole gasoline and discussed "hitting" a filling station. According to Joiner, at 5:30 a.m. on the morning of April 29, 1965, Dampier gave him a gun and told him to rob Culpepper who would open his store around 5:30 a.m. Joiner undertook the robbery, and during its course he and Culpepper became engaged in a gun battle from which Culpepper immediately died and Joiner received two gunshot wounds, one in his right chest and one in a thumb. The Dampiers, waiting in their car close by, picked up Joiner, drove him to the front door of the hospital, let him out and hastily departed his company.
Appellants' principal point goes to the admission of certain statements made by each of the defendants to police officers, prosecuting attorneys and a court reporter prior to their being carried before a committing magistrate. Citing as their main authority, Escobedo v. Illinois,[1] Joiner and Dampier contend that the trial court erred under the Sixth Amendment to the United States Constitution in admitting into evidence these confessions.
We will first examine the circumstances surrounding Dampier's statements. Dampier and his wife were arrested in the late afternoon of April 30 and were taken to the city jail at Gainesville, Florida. Dampier was questioned from 8:00 p.m. until 8:40 p.m. in the Gainesville Police Department offices on May 1 by the State Attorney. Present during this interrogation was the Assistant State Attorney, a Captain of the Gainesville Police Department, and Assistant State Attorney and an official court reporter who recorded the interrogation which occupies 28 pages of the transcript. In his statement Dampier said that he asked to see the State Attorney, wanted to give a statement, had not been mistreated and was not promised a reward or threatened. He detailed the facts about the journey from Pensacola to Gainesville and their movements prior to the shooting. He stated that on the morning Culpepper was shot, the three rode by Culpepper's store about dawn, and Joiner said, "That looks like a good place to rob" and "Let's pull over here"; he (Dampier) then pulled off the road and parked the car; since he had mentioned to Joiner that he and his wife once rented a trailer from Culpepper, Joiner asked what time Culpepper opened the store; he replied about six and then dozed off; the next thing he knew he heard a shot; he started the car and Joiner ran in front of it about a block down the road; Joiner got in the car stating that he was shot and wanted a doctor; he then drove to the hospital where he left Joiner. Dampier insisted that he did not know Joiner planned to rob Culpepper, yet his first question, after hearing the shot and picking up Joiner, was, "Is Mr. Culpepper hurt?" At the end of the questioning, the following colloquy took place:
"Q Anybody promise you anything?
"A I don't guess you could say I have been promised anything. Lieutenant Thames, or whatever his name is, told me I could make a phone call after I got through, after I got through making a confession, but he wouldn't let me make one before.

*185 "Q When did you want to make a phone call?
"A I been wanting to make one ever since I have been here. I've been asking.
"Q Who do you want to call?
"A I wanted to call my mother and ask her if she could bring some clothes, toothbrush, razor and things of this nature, and at the time I wanted a lawyer.
"Q Do you want a lawyer now?
"A It wouldn't do any good now, would it, sir?
"Q Who do you want for a lawyer?
"A If I could have made a phone call I was going to discuss it with my dad. I probably won't have to make y'all believe this, it will probably be up to somebody else: but believe me, if I knew things were going to turn out like this they never would have happened if I'd had anything to do with it."
Extensive testimony was taken in the absence of the jury with regard to the circumstances surrounding his interrogations. The trial judge heard this testimony, including the testimony of Dampier that he had previously been convicted of a felony on three separate occasions. He also heard testimony from several witnesses to the effect that Dampier made no request to use the telephone or for a lawyer prior to the interrogations. From an independent inquiry made in the absence of the jury, the trial judge concluded that Dampier's statements were freely and voluntarily made and were admissible in evidence. This record amply supports such conclusion.
Dampier insists that the test of "freely and voluntarily given" for admission of a confession has been superseded by the Escobedo case, and that now proffer of counsel must be made prior to the taking of a confession. This contention by appellants is founded upon their conclusion that the facts in the instant case disclose that a "critical stage" in the prosecution had been reached at the time of interrogations. This contention was rejected in Montgomery v. State,[2] wherein Justice Roberts, speaking for our Supreme Court stated:
"We have also considered the question of whether the appellant was denied `due process' of law when he was interrogated by police officers immediately after his arrest without being `effectively' warned of his right to remain silent or that his statements might be used against him, and in the absence of legal counsel.
"The mandate of the Sixth Amendment of the federal constitution, as made obligatory upon the states by the Fourteenth Amendment, Gideon v. Wainwright, supra [372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799], guarantees to an accused person the right to legal counsel `in all criminal prosecutions.' Before a suspect has been formally charged with a crime  while the investigative processes are still going on  there is no `criminal prosecution' to which this constitutional guaranty can attach. And the mandate of the Fifth Amendment to the federal constitution and Section 12 of the Declaration of Rights, F.S.A. of the Florida Constitution is that a person shall not be `compelled in any criminal case to be a witness against himself'  which mandate is, under our well settled rule, satisfied by proof that an extrajudicial confession was freely and voluntarily made, as noted above. Accordingly, it must be held that the appellant's contention in this respect is likewise without merit."
A like result was reached by this court in Myrick v. State,[3] wherein we held that *186 "* * * [e]xtra-judicial confessions are admissible in evidence when the trial judge after a thorough investigation into all the surrounding circumstances determines that it was freely and voluntarily given. * *"[4]
Joiner's contention under this point has even less merit than that urged by Dampier for at no time did Joiner claim that he requested counsel or otherwise brought himself within the Escobedo rule. We conclude that the Escobedo case has no application to the facts in this case, and that the joint contention of Joiner and Dampier as to being deprived of counsel in a manner contrary to the Sixth Amendment, is without merit.
Joiner also seeks reversal upon the ground that the admission of his confession violated his rights under the provisions of Section 12, Declaration of Rights, Constitution of the State of Florida, F.S.A. as construed by the Florida Supreme Court in the case of Reddish v. State.[5] As to this contention, the record reveals that Joiner suffered two gunshot wounds, one in the thumb and one in the chest, and he was carried to the hospital by Dampier immediately after suffering these wounds. He neither lost much blood nor was he in shock. He was given demerol immediately upon his admission to the hospital and every three or four hours until the next morning, at which time drugs and sedatives were discontinued upon the order of his doctor pursuant to the request of the police. His doctor testified that the discontinuance of the drugs and sedatives had no detrimental effect upon the defendant, that he would not have authorized such discontinuance had he been of the opinion that his patient's health would have been endangered by such action, and that Joiner was rational at the time of his interrogation. This court had occasion to examine the application of the doctrine of the Reddish case in the recent case of Myrick v. State, supra, wherein we approved the confession of Myrick as being freely and voluntarily made. Myrick had suffered gunshot wounds and was physically weak at the time of interrogation. We distinguished Myrick's condition from that as related in the Reddish case and likewise find from this record ample evidence to support the trial court's finding that Joiner was physically and mentally capable of making a free and voluntary statement. Without unduly belaboring the point, we hold that the rule as laid down in the Reddish case is not applicable to Joiner.
Joiner's next contention is that the trial court erred by refusing his proffer as to his defense of insanity. Joiner attempted to show that he was "mentally deficient" and that he suffered from a "mental disease or defect as distinguished from mental deficiency or low general intelligence." Under his view the medical testimony in this regard discloses that his concepts of right and wrong differ from that of society, so he would not be able to make such a decision as would an average person, and the sum total of the evidence introduced and proffered was sufficient to raise a reasonable doubt as to his insanity. We dispose of this point by quoting the following testimony of the psychiatrist whose opinion was proffered by the defense:
"He [the accused, Joiner] can distinguish within himself what he feels is right and wrong. He knows fairly well what society would consider right and wrong but he would not necessarily adhere to what society considers right and wrong, only to what he himself considers right and wrong  its confusing."
*187 When asked if Joiner knew the nature of the specific act he had committed, the doctor answered,
"I think he did know the nature of the act. He did know that society considered the act wrong.
* * * * * *
"I know of no problem that the Defendant has that would make me think his condition has changed in the intervening months [from the date of the murder] or that his status was any different then than it is now."
Under the McNaghten rule, which has been approved in numerous cases[6] by our Supreme Court, there was no evidence of insanity to submit to the jury.
Finally, Joiner contends that the taking of a blood sample by hospital authorities, the delivery of same to the police and its use in evidence constituted an unlawful search and seizure contrary to Section 12, Declaration of Rights of the Florida Constitution and the Fourth Amendment to the United States Constitution. We decline to delve into the merits of this contention, for the record contains such strong conclusive evidence in support of the verdict and judgment, whereas the blood sample was of such insignificant evidentiary value, so we would be bound to hold that the error, if indeed it is error, was harmless.
Having found no error, we affirm.
CARROLL, DONALD K. and JOHNSON, JJ., concur.
NOTES
[1] Eacobedo v. Illinois, 375 U.S. 902, 84 S.Ct. 203, 11 L.Ed.2d 143.
[2] Montgomery v. State, 176 So.2d 331 (Fla. 1960.
[3] Myrick v. State, 177 So.2d 845 (Fla.App. 1st, 1985).
[4] See Young v. State, 140 So.2d 97 (Fla. 1962).
[5] Reddish v. State, 167 So.2d 858 (Fin. 1964).
[6] Copeland v. State, 41 Fla. 320, 26 So. 319 (1899); Davis v. State, 44 Fla. 32, 32 So. 822 (1902).