197 So.2d 574 (1967)
Earnest COLLINS, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. 5904.
District Court of Appeal of Florida. Second District.
March 15, 1967.
Rehearing Denied April 26, 1967.
*575 William K. Howell, Jr., Winter Haven, and Thomas W. Perkins, of Kirkland & Perkins, Auburndale, for appellant.
Earl Faircloth, Atty. Gen., Tallahassee, and William D. Roth, Asst. Atty. Gen., Lakeland, for appellee.
PIERCE, Acting Chief Judge.
This is an appeal by Earnest Collins, Jr., defendant below, from a judgment and sentence imposed upon him by the Circuit Court for Hardee County, pursuant to a jury verdict convicting him of second degree murder upon trial of an indictment charging him with first degree murder.
The indictment charged Collins with the murder of one John D. Goff on July 11, 1964, by striking him with a stool. Several *576 motions were filed to the indictment, among which was a motion for change of venue on the ground that Collins could not receive a fair trial in Hardee County. On October 12, 1964, the trial Judge denied all pending motions, including the motion for change of venue. On October 24, 1964, after trial by jury, defendant was convicted of murder in the second degree and sentenced to life imprisonment.
Mr. Goff was owner of a country store and gasoline station on the south town limits of Wauchula on U.S. Highway 17. On the evening of Friday, July 10, 1964, Mr. Goff was in his store with his son, Marvin B. Goff. At about 1 o'clock in the early morning of Saturday, the 11th, the son, deciding that his father was going to stay up in the store, as was not unusual, left to spend the night at his father's home adjoining the store building. At about 3:25 A.M. a neighbor looked out and saw Mr. Goff standing in front of the store when a man walked up and they both went inside the store. The neighbor could not tell whether the man was white or colored or how he had gotten there.
A route salesman delivering bread for Sunbeam Bakeries, a Mr. Jowers, drove up in front of the store at approximately 4:40 A.M. on that morning.[1] He looked in the store, and at that time he saw a colored man coming out, thinking he was a casual early morning customer. He went on into the store, noticed the cash register was open, and that the arms had been broken off Mr. Goff's regular "lounge chair" and were on the floor. He then "walked down by the ice cream counter and looked over behind it and Mr. Goff was laying there on the floor" face down with both hands "kind of under him" with considerable blood around his head. Jowers then drove to the Sheriff's office and made the report. He gave a brief description of the man he saw leaving the store, but later testified that nothing in the man's actions caused him any suspicion. He told the officers he doubted if he would be able to identify him, and in fact subsequently "viewed two line-ups" at the Sheriff's office (both participated in by defendant Collins) and failed to make an identification.
Frank Tice, a Wauchula police officer, was going off duty about 4:55 A.M. when he received a call and went immediately to the Goff store. He saw the cash register open, an arm broken off the easy chair that usually sat directly inside the front door, then looked around and found Mr. Goff lying face down near the back door of the building with a bloody wound on his head. He noticed a stool toppled over on the floor and one of Mr. Goff's shoes off. Mr. Goff had stopped breathing and had no pulse. Tice turned the body over and there was an open pocket knife in the palm of Mr. Goff's right hand.
Sheriff Odell Carlton of Hardee County arrived at the store shortly after 5 A.M. and found the cash register open and all the currency taken, with a little silver left in the drawer. A large chrome metal stool with a red top cover was on the floor on its side about three or four feet from Mr. Goff's feet. Numerous photographs were taken by the Sheriff of the interior and exterior of the building, the body, the cash register, the stool, etc.
Lorenzo Elwood Mack, a 19 year old negro living in the same colored boarding house in the Wauchula "quarters" as defendant Collins, testified that on that night he and Collins were in a "crap game across the tracks"; that about 3 A.M. they drove back to the boarding house, then at Collins' request he drove to a place near the Goff store, where he stayed in the car while Collins got out, saying he was going to try to get some gasoline on credit; that Collins about fifteen minutes later came out of the store somewhat in a hurry and told Mack, "I hit the old man up there"; that they drove back to Mack's room, at which time *577 Collins took some money out of his pocket and insisted that Mack take some of it, which he did; that Collins said, referring to Mr. Goff, "[a]fter I hit him, knocked him down with my fist, he came at me with a knife and I had to hit him with a stool then."[2]
Gus Willie Cleve, a negro living near the boarding house, testified that about 4 A.M. he was standing on his front porch and saw Collins call Mack to go with him somewhere, that a few minutes later he saw Collins' car go north on Highway 17 with two men in it, neither of whom he could recognize.
There was evidence of an oral confession by the defendant at the jail house two days after he was arrested, which will hereinafter be gone into in more detail.
The foregoing is a fair synopsis of the State's evidence, exclusive of the confession. Numerous questions are raised on appeal, only two of which are worthy of discussion: (1) denial of the motion for change of venue, and (2) admission of the confession into evidence. We hold there was no error as to the former, but that the confession was erroneously admitted. We will take the two matters up separately.

A  Change of Venue
Defendant's petition for change of venue, filed September 30, 1964, fourteen days after the indictment was returned, alleged that he did not believe it would be "practicable" to receive an impartial trial in Hardee County. One affidavit of the defendant and three affidavits of his counsel, Jack T. Edmund, filed in support of the application, set forth substantially the following facts: that the deceased victim, John D. Goff, was a well-known white man who had operated a business in Wauchula; that after the death of Mr. Goff, the Herald Advocate, a weekly newspaper in Hardee County, with a circulation of about 3000 and read by over ninety percent of the populace, commenced carrying news accounts about the homicide, including statements by the investigating officers and the local Sheriff, which gave "a very graphic account of the charge"; that said articles "contained lengthy compilation of an alleged crime record of the defendant, along with pictures of the defendant" prominently displayed; that two issues of the newspaper, August 7 and 28, 1964, "contain references to the alleged confession of the defendant"; that on September 30, 1964, Attorney Edmund had attempted to interview a State witness, Lorenzo Mack, in the Hardee County jail, but was advised that such interview would be permitted only in the presence of a deputy sheriff "which would have created an untenantable (sic) situation and rendered it impossible" to properly interrogate Mack, and that it was "of paramount importance" that Edmund be permitted to question Mack in private; that permission had been secured from Mack's attorney to have the private interview; that defendant was "an itinerant negro * * *, not well known in the area * * *," and could not receive a fair trial there because he was "so odious to the inhabitants of Hardee County and the surrounding counties in the Tenth Judicial Circuit"; and that he had "no friends nor does he know anyone in said county" who would sign supporting affidavits to his venue petition.
No other affidavits were submitted except those of the defendant and his counsel. No other evidence was proffered to the Court. At the hearing upon the petition the trial Judge denied it "for the present," apparently to see if there would be any difficulty in getting a jury to try the case.
The trial started on October 22, 1964, and selection of the jury began. Forty-two prospective jurors were examined on their voir dire. The Court excused seventeen: the State excused three; the defendant excused ten. After the defense had exhausted its permissible ten peremptory challenges and twelve unchallenged *578 jurors were seated in the box, defense counsel moved the Court to allow three additional peremptory challenges, which motion was denied. Defense counsel thereupon renewed the motion for change of venue, which was denied. The trial proceeded with the twelve men then in the box. Defendant contends here that, upon the showing made, in the sworn petition, the supporting affidavits, and the proceedings upon voir dire of the jurors, the trial Court committed error in refusing defendant a change of venue. We disagree.
The questioning of Lorenzo Mack and the denial of three additional peremptory challenges may be disposed of in short order. If defense counsel were entitled as of right to question Mack in private and same was denied, a simple petition to the Court could insure such privilege; and besides, there is no relationship between a private interview with a witness and a change of venue. And as to the additional peremptory challenges, the law makes no provision for any challenges beyond the statutory limit.[3]
This leaves the venue petition resting for factual support upon these contentions: the victim was a well-known white business man in the community; the defendant was a friendless, itinerant negro with a reported criminal record; the local weekly newspaper had given coverage to the robbery and homicide and the developments thereafter ensuing; and the "difficulty" of getting an impartial jury to try the case.
A firmly-embedded principle of criminal jurisprudence is that a person accused of crime must, as a general rule, be tried in the community where the alleged crime took place; the community unit usually being the county. In Florida it is embedded in both the organic law and the statutes. Section 11, Bill of Rights, Florida Constitution, F.S.A., ordains that "[i]n all criminal prosecutions, the accused shall have the right to a * * * trial, by an impartial jury, in the county where the crime was committed * * *." Section 910.03, Florida Statutes, F.S.A., provides that "[i]n all criminal prosecutions the trial shall be in the county where the offense was committed unless otherwise provided by law." As stated by the 1st District Court in Rhoden v. State, Fla.App. 1965, 179 So.2d 606: "Section 11, Declaration of Rights, does not afford any change of venue, nor does the constitution elsewhere provide for such change and therefore a statute authorizing a deviation from the constitutional guarantee should be strictly construed and the constitutional right set forth in § 11, Declaration of Rights, jealously guarded. Nothing should be left to presumption." See O'Berry v. State, 1904, 47 Fla. 75, 36 So. 440.[4]
The Florida statutes provide specific requisites for such petitions. Section 911.02 provides that any defendant "may apply for removal of the cause on the ground that a fair and impartial trial can not be had * * *." Section 911.03 requires such application to "state the grounds on which it is based and shall also state the facts constituting the grounds." Section 911.05 requires the trial Judge to "hear the application and * * * either grant or refuse it after considering the facts set forth therein and the affidavit accompanying it and any other affidavits or counter affidavits that may be filed after hearing any witness produced by either side." Section 53.03 provides that a defendant desiring a change of venue "shall make application therefor on oath stating that he fears he will not receive *579 a fair trial in the court where the suit is pending * * * on account of applicant being so odious to the inhabitants of the county * * * that he could not receive a fair trial," that such application must "fully and distinctly set forth the facts upon which the application * * * is founded," and must "also be supported by affidavits as to the facts * * * by at least two reputable citizens of the county * * *." (Emphasis supplied.)
Hand-maiden to the foregoing is the rule that such application is addressed to the sound discretion of the trial Judge, whose ruling will not be disturbed upon appeal unless it affirmatively appears, from the facts contained in the record in support of the application, that the Court has abused its discretion.
The Florida appellate Courts have many times had occasion to pass upon the propriety of the trial Court's action in granting or denying a change of venue. In the vast majority of cases the trial Courts have denied such petition and such denials have been affirmed upon appeal. This is undoubtedly, in large measure, in deference to the stringent constitutional and statutory provisions aforesaid.
Leading Florida cases wherein it has been held a change of venue should have been granted are: Garcia v. State, 1894, 34 Fla. 311, 16 So. 223; Blackwell v. State, 1918, 76 Fla. 124, 79 So. 731;[5] and McRane v. State, 1940, 142 Fla. 240, 194 So. 632.
Leading cases holding a change of venue was not proper are: Wadsworth v. State, 1939, 136 Fla. 134, 186 So. 435; Haddock v. State, 1940, 141 Fla. 132, 192 So. 802; Hysler v. State, 1938, 132 Fla. 209, 181 So. 354; Shepherd v. State, Fla. 1950, 46 So.2d 880; Singer v. State, Fla. 1959, 109 So.2d 7; Irvin v. State, Fla. 1953, 66 So.2d 288; and Adjmi v. State, Fla.App. 1962, 139 So.2d 179.
The foregoing cases perforce contain lengthy resumes of the facts presented to the trial Court, pro and con, upon the merits of the application. It would be manifestly impracticable to quote largely from, or even to summarize, the language of the opinions, and such would unnecessarily burden the instant opinion. We suffice by referring to two cases typical of the opposing sides of the question. Thus, in McRane v. State, supra, the facts upon which the Supreme Court held a change of venue should have been granted are as follows (text 194 So. 633):
"Affiant (defendant's attorney) swears that he has spent approximately five days in Dixie County, Florida, in investigating the case with the view in mind of preparing his defense to said above charge. That he has talked to many people, inhabitants of Dixie County, Florida, about the said case. That in every instance, without a single exception, each and every one of said persons have advised affiant that it will be absolutely foolish, useless, and a very dangerous thing to attempt to try said cause in Dixie County, Florida. Many reasons were given for such statements; among them being that McRane, a fearless officer of the State Game and Fresh Water Fish Department, has made many enemies in Dixie County in enforcing the Game Laws without fear or favor; that the people of Dixie County, as a whole, have not in the past obeyed or conformed to said laws, and feel that said laws take away rights that have been theirs for years and years; and that McRane, in enforcing such laws has made many enemies who will work against him *580 in every way they can. Another reason given being that feeling ran so high against McRane the day he was arrested for the killing of Barber that the Sheriff of Dixie County, fearing mob violence, acted wisely and judiciously in rushing McRane away from Dixie County Jail to a jail unknown; that had he not done so, the chances are that McRane would have been taken away from the officers and killed by said mob; and that while no one is talking or saying anything about the case, and in fact refuse to say anything about it, such feeling still exists very strongly against McRane, in Dixie County. That in event McRane was not taken from the officers prior to his trial, and happened to secure an acquittal of the charges against him, then it was an almost certainty that he would never leave the County alive, that he would be killed. The main reason underlying all the objections were that the deceased, Eugene Barber, was of kin, either by blood or marriage to over fifty per cent of the people of Dixie County. That his family was so strong, politically and/or economically, that it would be useless to try and overcome the undue influence that such family exercises over the inhabitants of Dixie County. That while there were a few people in Dixie County who would be able to withstand the undue influence of such family and relatives, and not be swayed in reaching a verdict according to the evidence, that the number of such were so small that it was not worth considering. That a close kinsman of deceased is a member of the Board of County Commissioners of Dixie County, has hundreds of friends over the County, and is taking an active interest and part in the prosecution of McRane. That such kinsman's influence alone is sufficient to secure a verdict against the defendant, McRane, and that it is almost suicide for McRane to attempt to try said cause in Dixie County. Among other reasons given was that the killing occurred on November 29th 1938, that McRane was immediately rushed away from Dixie County, Florida, on account of fear of mob violence; that although feeling was at such a high pitch, and although a Regular Term of the Circuit Court would be held in a little over a month, a Special Term of said Court was called and McRane was indicted for First Degree Murder on December 21st 1938, brought up for arraignment on December 22nd, 1938, when feeling was very high against the said McRane, and that it appeared that McRane was being rushed to trial and not being given sufficient time in which to prepare his defense; that while they were not criticising the Court in any manner, yet it appeared that because of the prominence of the deceased's family, amounting to undue influence, such Special Term of the Court was called; that had it been a killing of some one other than a member of the Barber Family, a Special Term of the Court would not have been called. Affiant further swears that in many instances people whom he contacted advised him plainly that they did not know him, did not know whether they could trust him or not, that they did know the Barber Family, and were not going to discuss the case at all, and nothing that affiant could say would budge them one bit. Even when affiant pointedly told them that a man's life was at stake, they then refused to talk, or to have anything whatsoever to say about the case. Affiant further swears that in every instance where he and the persons to whom he talked, and who talked to him, and they had advised him of the conditions which are set forth in this affidavit, he then asked or requested such parties to make an affidavit setting up such facts, without a single exception, the people advised affiant that they could not afford to make such an affidavit because of the strong political and/or economic influence of the Barber Family. That such influence was so strong that if they signed such an affidavit, they would be immediately placed on a x `Black List', and no business would be given them by the Barbers, relatives or friends, and they simply *581 would not make an affidavit, although the facts as stated above were true. That they had to make a living, and as business wasn't the best in the world, they couldn't afford to risk having any part of what they had taken away from them. Others have as reasons for not signing affidavits that they were in politics, and were friendly to the Barbers and, therefore, couldn't sign. That the influence of the Barber Family was so strong that they couldn't afford to try, in any manner, to oppose it. Many others stated that the Barber Family, realizing that the defendant would try to move the case from Dixie County, Florida to another for trial, had purposely avoided being present at the arraignment of McRane on December 22nd, 1938, so as to prevent the case from being taken out of Dixie County for trial; that they felt that if the case was tried in Dixie County a conviction would be secured, but if it were taken out of Dixie County, they felt that McRane would be acquitted, and therefore stayed away from the Court House when McRane was brought for arraignment. Affiant further swears that, with a few exceptions, it has been impossible to secure affidavits setting out the above facts from inhabitants of Dixie County; that he has had four people trying, along with himself, to secure such affidavits, and each of such persons has advised affiant that the reasons set out above were the reasons why the people they had contacted had refused to sign the affidavits; that no person had stated that it was possible to secure a qualified Jury in Dixie County, Florida, to try said cause, but on the other hand, and in each and every instance such inhabitants of Dixie County had stated that it would be impracticable to secure a qualified jury in Dixie County, but refused to sign the affidavits for the reasons given above. Affiant further swears that, in his opinion, judging from what the inhabitants of Dixie County have told him, and judging from the manner in which the inhabitants have acted and/or talked when approached for the affidavits, that it is very impracticable to secure a qualified jury in Dixie County, Florida, to try said cause; that it would be unsafe and dangerous to try said cause in Dixie County, Florida."
Typical of the cases holding against a change of venue is Hysler v. State, supra, wherein the Supreme Court said (text 181 So. 358):
"On March 16, 1937, defendant presented a petition in the lower court for a change of venue in which it is alleged, among other things, that a fair and impartial trial of the defendant's guilt or innocence could not be had in Duval county because Clyde Hysler is odious to the inhabitants thereof; that the defendant has a large family connection by the name of Hysler, who for many years past have resided in Duval county and vicinity; that many of his family connections have criminal records, as shown by the proceedings and records of the state and federal courts in and for Duval county, and because of the many criminal prosecutions of the Hyslers the name is odious to the inhabitants and is hateful, detestable, and so offensive that this prejudice will not yield to the testimony concerning his guilt or innocence to such an extent that a fair and impartial trial cannot be had or obtained; that named newspapers with large circulations in Duval county since November 25, 1936, have carried a series of false, distorted, and untrue articles about the death of Mayme Elizabeth Surrency and husband, John H. Surrency, coupled with the evil and bad reputation of the Hyslers; that inaccurate accounts and hostile stories of the proceedings of the trial of the defendant for the murder of John H. Surrency were made conspicuous and prominent by these different publications to the detriment and injury of the defendant.
"The friends and relatives of the deceased made threats to lynch the defendant. Numerous persons collected on the street corners of the city of Jacksonville *582 when these crimes were discussed; expressions of bitterness and hatred were frequently made by the people of Duval county against the defendant; that the prevailing sentiment as expressed is that the defendant is guilty of the crime; that many inhabitants of Duval county openly stated that the jury is expected to find the defendant guilty; that because of the prejudice and ill feeling existed against the defendant in Duval county makes it impossible to obtain a fair trial."
When measured by the standards laid down in these cases, the instant petition is palpably deficient. As observed, it is argued that a change of venue should have been ordered because substantially of the following: the victim, Mr. Goff, was a well-known, respected business man in the community, while the defendant was a comparatively itinerate and friendless negro with a questionable, spotty record; the weekly newspaper in Wauchula had inflamed the public mind by unduly publicizing the case against the defendant; and the "difficulty" encountered in getting a jury that would be impartial.
An analysis of the selection of the jurors to try the case is quite revealing.[6] Of the twelve jurors who tried the case not one ever knew Mr. Goff. Only seven of the entire forty-two who were interrogated were at all acquainted with Mr. Goff, the Court excusing five and the defendant two. The defendant on the other hand excused five men who did not know Mr. Goff. And while most of the prospective jurors had read the Herald Advocate, some only casually, defense counsel peremptorily excused three who had not read any issue of the paper. All jurors questioned stated they would not be influenced by the newspaper.
So there was no "difficulty" encountered in selecting a jury. The record is silent as to how many prospective jurors had been originally summoned on the panel but it does reflect that only forty-two were questioned before a qualified trial panel was obtained. This Court judicially knows this is perhaps below the average in a capital case. The Court of its own motion excused seventeen veniremen, but largely because they were opposed to capital punishment or were commissioned deputy sheriffs or special deputies or held some public office or public employment. The questioning on voir dire strikingly reflects a composed and unprejudiced panel of citizens summoned for jury duty.
We have examined the issues of the Herald Advocate relied upon to show the alleged inflammatory newspaper dissemination and find nothing sensational about the handling of the admittedly brutal crime. The homicide occurred on July 11, 1964, Collins was arrested on August 5, 1964, and the trial began on October 22, 1964. Fourteen issues of the paper were published between the homicide and the trial, and eleven issues between the arrest and the trial. Nine total issues were filed in the case, only seven of which were after Collins was arrested. Thus four of the weekly issues between the arrest and the trial were not brought to the Court and presumably contained nothing about the case. Certainly, then, the coverage was not continuous, nor could it be said to have been extensive. The tenor of the articles was reasonably objective and not unduly intemperate. Certainly there was no systematic campaign to incite or envenom the mind of the populace, or to saturate the reading public with inflammatory propaganda.
Nowhere in the case was there the slightest intimation of mob action or public outcry against the defendant. No semblance of a lynching party reared its ugly head. No leaflets, circulars or scare-sheets were distributed or disseminated. The weekly newspaper did not carry a single editorial about the case. No indignation meetings *583 were ever held. No threat against the defendant was heard or expressed. All of these things and many more of similar vein happened in the reported cases hereinbefore cited. Actually the atmosphere of the community, so far as the record reflects, before and during the trial, was unusually tranquil and composed.
And last, but not least, the verdict of the jury finding the defendant guilty of second degree murder, when it could have quite easily from the evidence consigned him to the electric chair, is the most cogent indication that, at the time and place of the trial, Hardee County could and did produce a fair and impartial jury to try the defendant.
The able trial Judge properly denied the petition for change of venue.

B  The Confession.
In the light of the record we must hold the trial Court in error in admitting the proffered confession procured from the defendant while in custody. A review of the facts and circumstances surrounding the obtaining of the confession shows that, under the recent decisions, the confession was illegally obtained.
Collins was arrested on August 5, 1964, and on August 7, two days later, without counsel present, gave a confession at the County jail to deputy sheriff John Douthitt and two men from the Florida Sheriffs' Bureau, Norman Desilets and Cliff Powell.[7] In the confession Collins stated that on the night of July 10th-11th he was in a crap game at a house near the Burns' boarding house but about 3 o'clock got Lorenzo Mack to drive him down to the Goff store; that inside the store he gave Mr. Goff a five dollar bill in payment for a quart of oil, and they got into an argument over whether Collins had given him a five dollar bill or one dollar bill, and then Mr. Goff told him to get out of his place; that he said he wouldn't leave, he wanted his change and his oil; that Mr. Goff then went behind the meatbox to get the oil and soon came back from behind the counter with a knife in his hand; that he grabbed Mr. Goff's hand that held the knife and started choking him with his other hand; that they both fell to the floor, falling over a chair in the tussle; that he got off Mr. Goff and started out the door and at that time Mr. Goff got up and came at him again with the knife in his hand, whereupon Collins picked up a bar stool and swung around and hit Mr. Goff twice, then threw the stool down, went outside the store to his car, went back to the quarters, and into his boarding house. Two days later, on Sunday afternoon, August 9th, the investigators wrote up a narrative statement in writing and tried twice, on consecutive days, to get Collins to sign it but Collins refused.
The sequence of events between Collins' arrest on August 5th and the giving of the statement on August 7th vitiated the confession. On August 5th Collins was working at a citrus grove near Bowling Green in Hardee County, and while he was taking his noon luncheon break the Sheriff with two deputies approached Collins, arrested him without warrant for the murder of Mr. Goff and carried him immediately to the county jail. Some six hours later they took him before a Circuit Judge, who issued an arrest warrant, read it to him, and advised him what he was charged with. During that six hour interval Collins was kept in what was known as the "maximum security section," a cell wherein no other prisoner has been placed. In this special *584 cell Collins could talk to other prisoners in other cells but could not see anyone nor could they see him; there were "no bars or open places between him and the other prisoners, just one metal wall and an open hallway on the side, a large part of it."
Sheriff Carlton admitted that Collins was interrogated between his arrest and the time the warrant was issued, that the Circuit Judge did not advise Collins "with regard to his right to remain silent," but that "on the way from the Judge's office to the jail" he himself mentioned to Collins "his rights as to securing counsel, that if he was not able to, the State (sic) would appoint counsel for him." The Sheriff was asked if he could recall more precisely what was said when he advised Collins of his "rights" on the way back from the Judge's office to the jail. The Sheriff's response is so vitally significant to our disposition of this case that we quote verbatim from the record:
"A Yes sir, it was on the same day that he was arrested on the way back to the Jail. I told him that he had a right to counsel, that if he were not financially able to employ counsel that the State would appoint an attorney to represent him at which time he stated he wanted to call his father and he wanted to get his own counsel to represent him, he did not want the State to appoint counsel for him.

We told him that he could call him, his father who was living in Mississippi and he was allowed to use the phone to call him and he made  had to make two or three calls before he could get him on the phone.
But he was allowed to call him and he contacted his father and his father later came down and then made arrangements for counsel.

Q In relation to his being before Judge Kelly, can you give me the time element of his calling his father?
A Immediately after we got back, after we left Judge Kelly's office when I informed him of his right to counsel and we went on to the jail and put in the call at that time. I think that he did not get him the first time he called but he did  we let him keep calling until he did get him.

RECROSS-EXAMINATION
BY MR. EDMUND:
Q Sheriff, on that day sir that you allowed him to begin making his calls to his father and allowed him to continue making these calls until such time as he got his father. Right?
A Yes.
Q You knew that he was calling his father so that  for the purpose of having his father secure counsel for him. Is that correct?

A That's right, correct.

Q And yet you and your staff continued your interrogation of the man notwithstanding the fact that he had requested counsel, that he had requested the right to call his father and that you knew that he was in fact attempting to secure counsel. Is this correct, sir?

A That's correct. However we told him the State would appoint counsel for him at that time if that's the way he wanted it.
Q Yes sir, yes sir.
A But he said he didn't want it.
Q But by the same token you and your staff were aware of his efforts to obtain independent counsel?

A That is correct.

Q And you continued the interrogations and ultimately an alleged statement to which we are proffering this testimony  for which we are proffering *585 this testimony now was elicited from the defendant. Is that correct?

A That is correct. However, he was also told that he did not have to make a statement." Emphasis supplied.)
Collins was interrogated by the officers several times the following day, August 6th, each time "for an hour or greater." That afternoon, sandwiched in between the questionings, Collins was twice placed in a "line-up" in the jail house with four other colored persons, each suspect being brought in separately and, among other things, having to wear a hard hat similar to the one Jowers had testified the colored man was wearing in Goff's store the morning of the homicide. Jowers was in an adjoining room looking through a glass at the "line-up" and, according to the officers, identified Collins; but Jowers expressly disclaimed under oath any such identification later at the trial.
Collins was questioned at length the next day, Friday, August 7th, and on that evening the Sheriff told Powell, one of the F.S.B. men, that Collins hadn't told them "anything at all" and that he thought Powell was "wasting his time by carrying on any extensive conversation or questions."[8] It was shortly after this on the same evening that the confession was procured.
In the process of "laying the predicate" for admission of the confession in the absence of the jury, Desilets was asked to relate "the circumstances of the interrogation" and he replied:
"A Well, we took a statement from Collins. It was over here in the interrogation room of the Sheriff's office on the seventh of August. Prior to taking the statement, I determined whether or not Collins understood that he need not  Lieutenant Douthitt and I were present. I told  I advised  I asked Collins if he understood that he need not make any statement oral or written and that any statement that he did make could be used against him. I then asked him if he had been promised anything or threatened. I also advised him of his right to counsel. Well, then I asked Collins to tell us what happened and then he told us  Collins, then told us how he * *." (Emphasis supplied, but otherwise verbatim from the record.)
It will be observed that Desilets related what he told Collins, what he advised Collins, what he asked Collins, as to being threatened or promised anything, etc. But he did not at any time testify as to what the actual facts were. And his statement that "I determined" whether Collins knew his legal rights is somewhat naive. Such determination is a legal question, to be decided exclusively by the Court and not by the officer in charge of the interrogation, whose right and duty is only to relate what was said and done by the parties present.[9]
Collins' confessional offering was procured on the evening of August 7th  after two and a half days of persistent questioning by a deputy sheriff and two inquisitorial *586 experts[10]after he had been locked up in a solitary maximum security chamber at the County jail wherein no other prisoner has been incarcerated  after he had been twice forced to participate in a line-up and viewed by unseen observers  after he had been forced three different times to undergo a "polygraph exam"[11] conducted by the specialist Powell  after he had been confronted[12] by the officers with a letter allegedly written by him but intercepted by the Sheriff's office wherein he wrote he had been beaten by the officers[13]  and, most importantly of all, after he had told the Sheriff, forty-eight hours before the confession was procured, that he wanted a privately employed lawyer of his own choosing, had actually talked over long-distance telephone with his father in Mississippi relative to retaining such lawyer, and was waiting for his lawyer to show up. The officers admitted that "from the time he was arrested" they "were trying to get a statement or confession out of him," and also that the "investigation had narrowed down to the defendant as the principal and the only suspect."
This Court has had occasion recently to lay down the guide-lines for "eliciting" confessions from persons in official custody upon a specific criminal charge. We refer to Williams v. State, Fla.App. 1966, 188 So.2d 320, a case quite similar in factual and procedural posture to the instant case. The Williams case cited and quoted from Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246; Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265; Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799; Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977; and numerous other cases from the U.S. Supreme Court, as well as from Courts of last resort from many of our sister States. The Williams opinion, in somewhat lengthy detail, goes into the whole question of admissibility of confessions and what we said there does not necessarily have to be repeated here. The 10th headnote is pertinent:
"10. Where police officers, knowing that defendant had been in jail for three weeks charged with first-degree murder, that he had already been indicted for the crime, and that he had a lawyer, took defendant out of his jail cell and transported him to a small room, closed the door, and thereafter obtained a confession from him, confession was inadmissible, even though defendant did not in terms demand that his lawyer be present. U.S.C.A.Const. Amends. 5, 6."
It will be noted that, as indicated in the foregoing headnote, Leroy Williams had been in jail for three weeks and had been indicted for murder. But the same rule is equally applicable where the accused has merely been arrested, charged with the specific offense, at the time the interrogation *587 takes place. This will be seen from the 11th headnote in the Williams' opinion as follows:
"11. Constitutional right to counsel does not arise from a mere request for counsel, but from advent of accusatory stage of proceedings against defendant. U.S.C.A.Const. Amend. 6."
The words in the last headnote, "from advent of accusatory stage of proceedings" mean "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" or, in other words, where the investigation has "focused on an accused." Escobedo v. State of Illinois, supra; Miranda v. State of Arizona, infra.
The rationale of Leroy Williams and the cases reviewed therein is that 
(1) where the investigatorial process has centered upon an individual who is in official custody for a specific offense, he must be clearly and effectively advised of his right to have counsel present during any questioning;
(2) if the individual states, or indicates in any manner, that he wants to consult an attorney, the interrogation must cease; and
(3) these requirements are entirely independent of the element of voluntariness.
The officers in the instant case violated these precepts. When defendant Collins on the afternoon of August 5th told the Sheriff he wanted a privately employed lawyer and phoned his father in Mississippi from the Sheriff's office relative to retaining one, this was a clear indication that he wanted an attorney. From that point on, even if not sooner, there should have been no questioning in the absence of an attorney. The confession admitted in evidence was procured some forty-eight hours later, and after intensive questioning and other dubious practices. The confession should not have been admitted.
A further reason why the confession was inadmissible was that, at the time it was allowed to go to the jury, there had not been sufficient proof of facts that it was voluntary and that it was free of all "debilitating elements" that would exclude it, irrespective of the absence of counsel. Our holding along this line in Leroy Williams is equally applicable here and need not be reiterated. (See text 188 So.2d 327-329).
We therefore dispose of this appeal upon authority of Leroy Williams and the cases therein referred to. Confirmation of the soundness of our decision here and also in Leroy Williams comes from the U.S. Supreme Court in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, handed down on June 13, 1966.[14] The observations of the high Court *588 in Miranda are interesting in the light of the disposition we make here. In Miranda it was said that 
"* * * the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. * * * Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. * * * The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."
For the reasons pointed out, it was fatal error to admit the confession into evidence.[15] Other matters raised in the lower Court are either obviously without merit or will be unlikely to occur in any further trial of this case.
Reversed and remanded.
HOBSON, J., concurs in conclusion only.
DRIVER, B.J., Associate Judge, dissents with opinion.
DRIVER, B.J., Associate Judge (dissenting).
I would affirm the judgment of the circuit court on the authority of Montgomery v. State, Fla., 176 So.2d 331; Calloway v. State, Fla., 189 So.2d 617; Dampier v. State, Fla.App., 180 So.2d 183; Male v. State, Fla.App., 189 So.2d 521; Thomas v. State, Fla., 92 So.2d 621; Epperly v. State, Fla.App., 189 So.2d 531; and Miori v. State, Fla.App., 189 So.2d 208.
The confession which the majority opinion holds inadmissible was one given freely and voluntarily by the defendant and does not violate the precepts of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. It was obtained by proper means during a perfectly legitimate investigation of a murder.
The fundament of the majority opinion is succinctly set forth in the following quotation from that opinion:
"Collins' confessional offering was procured on the evening of August 7th  *589 after two and a half days of persistent questioning by a deputy sheriff and two inquisitorial experts after he had been locked up in a solitary maximum security chamber at the County jail wherein no other prisoner has been incarcerated  after he had been twice forced to participate in a line-up and viewed by unseen observers  after he had been forced three different times to undergo a `polygraph exam' conducted by the specialist Powell  after he had been confronted by the officers with a letter allegedly written by him but intercepted by the Sheriff's office wherein he wrote he had been beaten by the officers  and, most importantly of all, after he had told the Sheriff, forty-eight hours before the confession was procured, that he wanted a privately employed lawyer of his own choosing, had actually talked over long-distance telephone with his father in Mississippi relative to retaining such lawyer, and was waiting for his lawyer to show up."
This quotation does indeed paint a black picture of police methods and if one accepts this description of what is contained in the record, then certainly reversal is in order. However, when subjected to the acid test of close analysis the tones of this picture lighten up considerably.
Each and every fact relied upon for reversal of the lower court's judgment was before the able and experienced trial judge who scrutinized these facts closely and only after he had satisfied himself that the defendant had made the confession freely and voluntarily did he allow it to go before the jury, and then under proper instruction as to how the jury should receive the confession. It seems to me that in arriving at the conclusion which it has, the majority opinion necessarily requires that this court, months later and miles away, substitute its judgment for that of the trial judge. This is wrong and contrary to the repeated rulings of the Supreme Court of this State and of the other Appellate Courts of the State.
Though not expressly stated as so, it is to be implied from the majority opinion that no single one of the acts complained of would have, standing alone, been sufficient to justify reversal. Presumably therefore, it is the totality of all the circumstances surrounding the obtaining of the confession which forms the basis for the majority opinion. This strikes at the fundamental rule that it is the exclusive province of the trial judge to pass upon and resolve the factual issues determinative of whether a confession, whose admissibility into evidence is under attack, was freely and voluntarily given. Calloway v. State and Thomas v. State, supra, are the culmination in a long and unbroken line of cases out of the Supreme Court of Florida which have consistently held to the proposition that once the trial court has made a determination on the issue of the voluntary-involuntary character of a confession, the trial court's ruling is conclusive and will not be disturbed if there are any facts which reasonably support the ruling.
Dampier v. State, Male v. State and Epperly v. State, supra, reiterate this principle.
Keeping the above mentioned principles in mind, it is appropriate to review the record to determine if the conclusion of the trial court might arguably have any basis in fact. If any reason can be found to justify the ruling of the trial court, then the case ought not to be reversed.
We now advert to the record. What does it show?
The alleged "two and a half days of persistent questioning" consisted of the following, according to the record: on the day of defendant's arrest, which occurred at twelve noon, he was interviewed for less than one hour immediately after his apprehension; the next day, August 6th, he was interviewed for only an hour, or a little more; and on August 7th, the third day, the record reveals that he was first interviewed for approximately thirty minutes by Officer Douthitt, followed by *590 approximately an hour's interview by Officer Powell, at which time the defendant came forth with his "confessional offering." This falls far short, it seems to me, of what ought to be construed as "two and a half days of persistent questioning."
The so-called "inquisitorial experts" were two police officers simply trying to discharge their duties. Concededly, they were experienced and testified that they had interviewed or interrogated criminal suspects on many occasions in their police work. Certainly it ought not to be expected that an investigation of the most serious crime denounced by statute would be turned over to the "rookies on the force," nor is it a matter for amateurs, but even so it is not shown that the interviewing officers exercised any trickery, coercion, or undue influence on the defendant, nor that any reprehensible techniques were followed by them during the questioning of the defendant.
Collins was held in the maximum security area of the Hardee County Jail, and it is to be assumed from the language used in the majority opinion describing this place of confinement that it had some bearing on the defendant's confessing, presumably against his will. As described in the testimony of the witnesses the so-called "solitary maximum security chamber at the County Jail" was simply a regular cell, no different from any other except that it had a solid partition between it and the neighboring cell; however, the occupant could converse with the other prisoners in the jail. Its only variance from other cells was that one confined therein could not visually observe his neighbors. Certainly there is no showing that it was any less comfortable, had less light and air, or other conveniences than the other cells in the jail. Liable as he is for the custody of prisoners, the decision by the Sheriff not to put one charged with murder in the first degree in the common "bull pen" is understandable.
The defendant did participate in the "line-up" as recounted. This was for the purpose of identification and is a practice followed almost universally by every law enforcement agency in the country, and we find it difficult to perceive how simply being looked at could intimidate the defendant, particularly under circumstances where he was not even aware of the observers. It is not shown that anything of an unusual nature occurred during the line-up calculated to affront the sensibilities of the defendant.
The polygraph examination given the defendant, insofar as may be gleaned from the record, played no part in the trial, nor in inducing the defendant's confession and to attribute to it significance in prompting the defendant's confession necessarily requires an indulgence in speculation, for there is no factual basis for it in the record.
The defendant was asked about the letter which he wrote charging that he had been beaten by the police officers. It is abundantly clear from the record that the claims made by Collins that he had been beaten were false and without foundation. These charges justified inquiry and if the defendant was disconcerted at being caught in a bald-faced lie, this ought not to vitiate his confession if otherwise freely and voluntarily made and given.
It is important to note here that the defendant, who had every opportunity to do so, at no time ever claimed that he had been coerced, intimidated or offered any promise of hope of reward to make his statement, neither is there to be found any complaints by the defendant that the above mentioned actions on the part of the police officers intimidated him or overcame his will or desire to remain silent. To the contrary, when asked why he gave the statement he replied from the witness stand:
"A. Well, I was scared, and tired of them calling me names and jigging at me, so I went on and made the statement.
"Q. What were you scared of?
"A. Scared of going to the electric chair."
*591 A defendant's apprehension and fear resulting from an awareness that he is confronted by severe punishment on account of his crimes does not in itself justify denial of admissibility of a confession given freely and voluntarily.
We now turn to the most serious charge of misconduct levelled at the police officers, viz., they denied the benefit of counsel until after they had obtained the confession. This conclusion requires supposition and speculation. The record demonstrates that the defendant, Collins, was arrested on the 5th of August during the noon hour; that he was then questioned for approximately an hour and as soon as the judicial officer was available he was taken before the committing magistrate. The defendant was instructed by the Sheriff, who had him in custody, that he, Collins, had the right to remain silent; that he did not have to say anything, and that he was entitled to an attorney to represent him, and that if the defendant did not have an attorney or could not afford one, then the State would furnish him one. This is unrefuted in the record.
The defendant declined the offer of the Sheriff to obtain a lawyer for him and countered with the statement that he, the defendant, wished to call his father in Mississippi to talk to him about the trouble defendant found himself in. The defendant was permitted to call his father and there is some inference to be gathered from the cross-examination of Sheriff Carlton by defense counsel that the Sheriff knew the defendant wanted a lawyer of his own choosing to be selected by his father in Mississippi. We reiterate that this may be inferred because the record does not indicate that the defendant actually informed the Sheriff that he wanted, or expected, his father to hire him a lawyer; neither does the record reflect that he indicated by word or deed, hint or suggestion, that he wanted to consult an attorney before talking further to the Sheriff or his deputies. We are persuaded that even if the defendant had called his father specifically to obtain private counsel, this would not necessarily make his confession inadmissible. See Male v. State, supra.
The majority opinion seeks to cast about the defendant the protective mantle of Escobedo v. State of Illinois; however, there is a real and substantial distinction between the facts in Escobedo v. State of Illinois, supra, and the facts in the case sub judice. In the former case the police officers took affirmative action to deny Escobedo the opportunity to confer with his lawyer who was present clamoring to see his client, yet the police persisted in keeping Escobedo incommunicado from his lawyer until a confession was obtained. Read Escobedo carefully as one may, there is to be found no admonition requiring police officers to furnish an accused person counsel against his will before conversing with him, nor that the interrogation processes cease until the defendant obtains counsel at some indefinite time in the future. Certainly there is nothing in the record of this case indicating that the defendant either objected to interrogation or that he requested counsel before talking to the police officers.
The majority opinion leans heavily upon this Court's decision in Williams v. State, 1966, 188 So.2d 320. In doing so, it seems to overlook the distinction that in the Williams case the defendant had been confined in jail for three weeks, had already been indicted, and had a court-appointed lawyer who was conferring with Williams frequently and which facts were known to the police officers. But even conceding arguendo that there is no distinction between the case under discussion and the Williams case, it seems that controlling herein is the hereafter stated pronouncement of our own Supreme Court in Montgomery v. State and Calloway v. State, supra, and if the Williams case conflicts with them, then we ought to recede from its holdings to the extent of such conflict.
This court, in Williams v. State, supra, and by its majority opinion herein seems *592 determined to abandon for consignment to the judicial junk heap the voluntary-involuntary test for admissibility of confessions. To do so, we are persuaded, puts this court on a collision course with the judicial route charted by the Supreme Court and the other Appellate Courts of this State. Mr. Justice Roberts, writing in language remarkable for its lucid and unmistakable terms, in Montgomery v. State, supra, reaffirms the rule that the test for admissibility of confessions in Florida is their voluntariness, notwithstanding Escobedo. This language is worthy of quotation:
"The appellant urges this court to adopt the federal rule; but here, as in Young v. State, supra [Fla., 140 So.2d 97], `no cogent reason for receding from what has long been the rule in this state' has been advanced. As stated in the Young case
`After all is said, the test as to the verity of a confession is whether or not it was freely and voluntarily made. Did it come from the free will of the accused or was he compelled by unlawful means to make the confession?'"
and on pages 334 and 335 of the same opinion we find:
"* * * the mandate of the Fifth Amendment to the federal constitution and Section 12 of the Declaration of Rights, F.S.A. of the Florida Constitution is that a person shall not be `compelled in any criminal case to be a witness against himself'  which mandate is, under our well settled rule, satisfied by proof that an extrajudicial confession was freely and voluntarily made, as noted above. Accordingly, it must be held that the appellant's contention in this respect is likewise without merit.
"In so holding we have not overlooked the decision of the United States Supreme Court in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. In that case it was held, in a five-to-four decision, that the accused was denied due process of law when police officers refused to allow him to see his attorney during his interrogation by police, even though his attorney had been called by a relative and was in the building and attempting to consult with the accused (and did, in fact, see him through an open door and motioned to him to keep silent), and where it appeared that the police denied him access to his attorney and questioned him in order to force him to make a statement corroborating the evidence they already had concerning his guilt. A majority of the court held, by what seems to be a kind of judicial legerdemain, that the accused's incriminating statements made in these circumstances  even though proved to have been made voluntarily, without force, threats or inducements  were rendered inadmissible by the refusal of the police to allow Escobedo to consult with his attorney; that this constituted a denial of `due process' of law under the Fourteenth Amendment, requiring a reversal of a state court judgment of conviction which had been affirmed by the court of last resort of the state.
"* * * The appellant made no rerequest that counsel be appointed to assist him, either before or at the time of his confession; nor is it claimed that he was unaware of his right to remain silent. In view of the fact that the majority opinion in Escobedo v. State of Illinois, supra, noted several times that due process was denied `under the facts of this case', or similar language, we do not conceive that it intended to overrule its previous decisions holding extrajudicial confessions admissible in a proper case even though the accused did not have the benefit of counsel at the time, see Cicenia v. Lagay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523, and Crooker v. [State of] California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448. We hold, therefore, that, *593 since the circumstances here are distinguishable from those in Escobedo, the decision in that case is not controlling." (Emphasis supplied.)
That this is still the law of Florida is confirmed in Calloway v. State, supra, where the admissibility of a confession was upheld by the Supreme Court of Florida after applying the voluntary-involuntary test. It is to be noted, incidentally, that Calloway's confession was given under facts showing even harsher treatment than that surrounding the defendant, Collins, in this case. Though unnecessary for the reason that the Supreme Court of Florida is still the final arbiter of the law of this State it is interesting to observe that other Appellate Courts of Florida have ruled contrary to Williams v. State, supra, and the majority opinion herein, and that their opinions are in accord with Montgomery v. State and Calloway v. State, supra. See Epperly v. State, Male v. State, and Miori v. State, supra, all recent cases. Particularly pertinent to the problems under review is Male v. State, wherein a confession was upheld as being admissible even though it was obtained by the police after the defendant had called his lawyer and talked with him by telephone, but before the lawyer arrived at the police station.
The effect of the majority ruling is so dismaying by virtue of its departure from the established principles prevailing in the jurisprudence of Florida that it has caused this dissent to extend to a length greater than the writer would have preferred.
This Court seems to have enthusiastically taken as its touchstone the implied invitation of the United States Supreme Court alluded to in Footnote 14 of the majority opinion:
"Of course, States are still entirely free to effectuate under their own law stricter standards than those we have laid down and to apply those standards in a broader range of cases than is required by this decision. (Emphasis supplied.)"
With all due deference to the majority opinion filed in this case, we deem it imperative in the name of consistency and uniformity of law that we march to the judicial cadence as called by the Supreme Court of Florida and not hurry the count with the sure and certain result of creating confusion and disorder in the ranks of the Bench and Bar of this State.

On Petition for Rehearing
PER CURIAM.
Counsel for Appellee having filed in this cause a Petition for Rehearing and the same having been considered by the Court, it is
Ordered that the said Petition be and the same is hereby denied.
PIERCE, Acting C.J., and HOBSON, J., concur.
DRIVER, B.J., Associate Judge, concurs specially.
DRIVER, B.J., Associate Judge (specially concurring).
I must concur in the decision of my brethren to deny the Petition for Rehearing in this cause, but in doing so feel constrained to briefly express my reasons for such concurrence.
Equivocation or temporizing from the position taken in the dissenting opinion filed in this cause is not to be inferred from this concurrence in the denial of Petition for Rehearing. However, the arguments, causes, and grounds upon which Petition is predicated were not the subject of omissions or oversights but were carefully considered in both the majority and dissenting opinions. To grant the Petition for Rehearing would serve no purpose other than to permit a re-argument of issues already decided.
This is not the purpose of granting rehearings under Florida Appellate Rule 3.14, 31 F.S.A. as we understand it.
NOTES
[1] Goff's store was the first stop on his delivery route and Jowers always checked with a big clock Mr. Goff had on the outside of the store to see if he was on time.
[2] There were numerous discrepancies between Mack's testimony and that of other witnesses.
[3] F.S. Section 913.08 F.S.A. provides: "The state and the defendant shall each be allowed the following number of peremptory challenges: (1) Ten, if the offense charged is punishable by death or imprisonment for life; * * *."
[4] In O'Berry the Supreme Court reversed a conviction for the reason that the trial Court had erroneously granted a change of venue at the instance of the State Attorney, based upon affidavits that a fair and impartial jury could not be obtained in the county where the indictment was returned.
[5] Actually the Supreme Court, in the Blackwell case, technically held that "[a]s the court below decided that question in the affirmative, and as a jury was obtained, each member of which swore that he was unprejudiced, and as the case will have to be reversed on other grounds, we are not inclined to disturb the court's conclusion upon that point," but it is reasonably apparent from the entire opinion that if disposition of the appeal had rested upon this ground alone the case would have been reversed. As a matter of fact, the petition for change of venue was held good on another ground, namely, the alleged prejudice of the trial Judge.
[6] The entire interrogation of the prospective jurors upon void dire was taken down by the Court Reporter and the transcription comprises 241 pages of the record here.
[7] These investigators could only have been activated "upon request of the sheriff." F.S. Sec. 30.39, F.S.A. Incidentally, altho Sec. 30.39 affirmatively provides for promulgation of "appropriate rules and regulations" under which such investigators of the Florida Sheriffs' Bureau may operate, no such rules have been filed by the Bureau with the Secretary of State, as mandatorily required by Sec. 120.10, et seq. Such rules would appear not to be such as relate "solely to the internal organization and management of (the) agency, and not affecting the rights of the public," which alone would exempt them from such filing. Sec. 120.15.
[8] A revealing study that might indicate why the F.S.B. men were brought in is disclosed from the record during cross-examination of the Sheriff. He was asked, "[a]nd did, sir, Mr. Powell say to you, `well, Sheriff, this is my job and this is what I intend to do,' and did you at that time state to Mr. Powell that it was okeh with you, you were not going to call his boss and have him chewed out but you felt he was wasting his time? Did you have this conversation?" The Sheriff replied, "Not exactly in those words." It is unnecessary to comment upon the obvious inference.
[9] Desilets later in his testimony again reiterated what he had formerly said, in the further statement: "He (Collins) came in and like I said we determined whether he understood his rights or not and then * * *."
[10] Desilets in his testimony admitted that when interrogating a suspect he was in fact pitting his "mind against" the suspect's in "an attempt to elicit information from him"; that it was his practice to "apply psychology in the eliciting of information"; that this was "considered good and standard procedure in police interrogation work"; and that his "applied psychology had the desired effect upon this defendant (Collins) in that ultimately" he "elicited" the confession from him. Desilets also testified that agent Powell was "considered one of the most capable men" in the polygraph field and that "a good, competent, particularly excellent polygraph operator must of necessity also use or apply psychology" the same as he, Desilets, did.
[11] It is common knowledge, even to laymen, that results of polygraph tests are not admissible in Court.
[12] It is interesting that Collins was never "confronted" by Lorenzo Mack during all the interrogations and other bizarre happenings at the jail, altho they were apparently in the same building.
[13] When the letter was read back to Collins by the officers they told him "there was a good possibility he would go to the electric chair."
[14] On June 20, 1966, one week after the Miranda opinion was handed down, the U.S. Supreme Court delivered opinion in Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, wherein it was held that the Escobedo case and the Miranda case should not be applied retroactively, but that Escobedo would affect "only those cases in which the trial began after June 22, 1964, the date of that decision," while Miranda would apply "only to cases in which the trial began after the date of our decision one week ago," June 13, 1966. Under this pronouncement Escobedo is clearly applicable to the instant case in point of time. And to all intents and purposes, while trial of the instant case was held before the Miranda opinion, the holdings in Miranda are likewise applicable here for the reason that everything said in Miranda was based directly upon previous cases handed down by that Court, or to use the language of the Court itself in Miranda, "[we] start here, as we did in Escobedo, with the premise that our holding is not an innovation in our jurisprudence, but is an application of principles long recognized and applied in other settings. We have undertaken a thorough re-examination of the Escobedo decision and the principles it announced, and we reaffirm it. That case was but an explication of basic rights that are enshrined in our Constitution * * *." The Johnson opinion says practically the same thing. Furthermore, it is doubtful if such non-retroactivity of Miranda applies to State court cases at all. This is so, because Johnson v. State of New Jersey plainly states, "[w]e recognize that certain state courts have perceived the implications of Escobedo and have therefore anticipated our holding in Miranda. Of course, States are still entirely free to effectuate under their own law stricter standards than those we have laid down and to apply those standards in a broader range of cases than is required by this decision." (Emphasis supplied.) This would still leave a clear field of non-retroactivity of Miranda as to all cases tried in the Federal Courts and also even State cases when they might reach the Federal level.

But, as stated in the body of the opinion, the statements in Miranda are not necessary for determination here.
[15] In justice to the trial Judge, the opinion in Williams was not handed down until long after the instant trial.